Page 1

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
               Plaintiff           )
                                   )
         -VS-                      ) Criminal No. 08-10223-PBS
                                   ) Pages 1-70
ALBERT GONZALEZ,                   )
                                   )
               Defendant           )
```

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 11, 2009, 10:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2        STEPHEN P. HEYMANN, ESQ., Assistant United States
     Attorney, Office of the United States Attorney,
3    1 Courthouse Way, Suite 9200, Boston, Massachusetts, 02210,
     for the Plaintiff.

4

5        MARTIN G. WEINBERG, ESQ., Martin G. Weinberg, P.C.,
     20 Park Plaza, Suite 1000, Boston, Massachusetts, 02116,
     for the Defendant.

6

     ALSO PRESENT:
7

8        SAMUEL J. BUFFONE, ESQ. and CORI A. LABLE, ESQ.,
     Ropes & Gray, LLP, One International Place, Boston,
     Massachusetts, 02110-2624, for TJX Corporation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1            P R O C E E D I N G S

2        THE CLERK:  The case of the United States V.

3    Albert Gonzalez, Criminal Action 08-10223, will now be heard

4    before this Court.  Will counsel please identify themselves

5    for the record.

6        MR. HEYMANN:  Your Honor, Steve Heymann on behalf

7    of the government.  I should also note that behind me in the

8    courtroom are attorneys Samuel Buffone and Cori Lable, who

9    have on behalf of TJX, one of the major victims, moved to

10   intervene, or at least be heard during the course of this

11   proceeding.

12       MR. WEINBERG:  Good morning, your Honor.  Martin

13   Weinberg on behalf of Albert Gonzalez, who is present in

14   court.

15       THE COURT:  All right, thank you.  I think I'll

16   get to the motion to intervene later because regardless of

17   whether they are formal intervenors or not, I will allow

18   them to be heard.  So let me start with the fact that I

19   understand the government has moved a fair amount off of the

20   original protective order.  So why don't you describe to me,

21   if you would, what the current posture of the government is

22   with respect to discovery.

23       MR. HEYMANN:  Your Honor, if I may, perhaps a

24   brief introduction would also be helpful or useful.

25       THE COURT:  Yes.  I was also hoping, do you have a

1    copy of what it is we're talking about?

2            MR. HEYMANN:  The order itself?

3            THE COURT:  No.  What one of these documents looks

4    like, you know, what do --

5            MR. HEYMANN:  Let me, if I can, I guess, take you

6    through three or four steps.  The first is what, frankly,

7    the defendant did, what the risk is which describes what

8    these documents are, what we're talking about; what makes us

9    think that we need to do something here; and then describe

10   with you, if I can, the, candidly, unprecedented discovery

11   mechanism that the government has put together for the

12   purpose of this to balance the risk and the production.

13   It's $150,000 worth of discovery mechanism that's in motion,

14   and, to my knowledge, unprecedented in this district and

15   with any case in the Secret Service.

16           The defendant is charged with and committed the

17   largest identity theft case in history.  Along with

18   coconspirators, not all of whom are arrested, not all of

19   whom are in control, he broke into tens of national

20   retailers' credit card processors and banks' computer

21   networks, the ones in many cases that process financial

22   transactions.  When you go to the store and you give them

23   your debit card or credit card, there's a whole computer

24   network that processes those.  And he broke into those

25   stealing tens of millions of credit card numbers, debit card

1   numbers, and sold those, used those, cashed those out; and

2   also the password and account credentials for people who are

3   on the network so you could go in and use the network; and,

4   lastly, developed means of attack for the systems that

5   identified the computers that were vulnerable so that you

6   could go back in.  And this information was stored on his

7   computers, the computers of coconspirators, the computers

8   abroad throughout the system.

9          Okay, so what's the risk here?  The risk here, to

10  get to your question about what we're really talking about

11  here --

12         THE COURT:  What does one of these documents --

13  what, have you printed out --

14         MR. HEYMANN:  There were twenty or so computers

15  seized.  Sometimes they're described as computer servers.  A

16  server just means something that stores information and

17  provides help.  The backup system for the court's network

18  would be a computer server.  There were computer servers,

19  computers overseas accessible.  We seized two in the

20  Ukraine, one in Latvia, one in Argentina.  These were

21  computers that you could access over the Internet where

22  there were massive amounts of information stored.  We

23  seized --

24         THE COURT:  Yes, but, in other words, what does a

25  page look like?  Is it just a series of numbers?  Is it

1    "This is our how our scheme worked" typed out like a novel?

2    I mean, what are we talking about?

3              MR. HEYMANN:  It can be a variety of things.

4    There can be -- if I can just sort of describe the

5    categories, there are files which contain descriptions of

6    how to break into a computer or files which contain

7    descriptions of passwords and account information.  I'm

8    sure --

9              THE COURT:  So thousands of numbers?  Like, in

10   other words, a whole page just of passwords?  Is that what a

11   lot of these documents are?

12             MR. HEYMANN:  It could be -- they're not

13   necessarily stored in document form.  You know, there's

14   files that contain, for example, tens of millions of credit

15   card and debit card numbers, many of which are expired.

16   But, for example, we ran a test against one of them, and

17   30,000 --

18             THE COURT:  So a series of numbers?

19             MR. HEYMANN:  Those would be a series of numbers.

20   Then there would be descriptions of -- there would be

21   classes of passwords and accounts.  May we approach the

22   bench for a minute, your Honor?  It's necessary to answer

23   your question.

24             THE COURT:  Well, do you have a copy that you

25   could show me?

1          MR. HEYMANN:  No.  I just need to approach the

2     bench with counsel for a minute.

3          THE COURT:  All right.

4          (Sealed side-bar conference.)

5          THE COURT:  Let's go back there.

6          (End of side-bar conference.)

7          THE COURT:  We are going to deal with the unique

8     issues perhaps that arise from one computer later on, but

9     right now the comment I made here at side bar, which may be

10    of interest to other people, is some interest in all the

11    other computers, what kind of information is on there, and

12    how as a practical matter a defense attorney can prepare a

13    case without being able to have some hard copies.

14          You must have printed some out for your own use,

15    right?

16          MR. HEYMANN:  Probably fifteen pages total.  Most

17    of it, they're -- well, with the exception, putting aside

18    the computer equipment that we are now talking about on the

19    side, the issue with respect --

20          THE COURT:  You're setting up a huge computer

21    room, as I understand it, with $150,000 worth of equipment.

22    Where is the room?

23          MR. HEYMANN:  The room is at Carnegie Mellon in

24    Pennsylvania.  Part of --

25          THE COURT:  So it means he has to go down to

1   Pennsylvania every time?

2           MR. HEYMANN:  No.

3           THE COURT:  All right.

4           MR. HEYMANN:  What will happen is that the

5   information will be secured in their secure facility.

6           THE COURT:  Yes.

7           MR. HEYMANN:  Each defense counsel, and he has

8   four defense counsel right now, each --

9           THE COURT:  Who, who?

10          MR. HEYMANN:  The defendant.  He has three in this

11  proceeding and one in New York.

12          THE COURT:  Who else?

13          MR. WEINBERG:  There is two other lawyers in this

14  proceeding.  One is Rene Palomino from Miami, who is

15  Mr. Gonzalez's principal counsel, and he is his counsel in

16  both the New York and in the Boston cases.  There is a third

17  lawyer, myself being the second one, there is a third lawyer

18  who is a lawyer in Maine named Paul Trusiani, who's, quite

19  frankly, a starting lawyer, although he's a man of some

20  maturity.  He's been in business, went to law school in

21  midlife.

22          THE COURT:  He doesn't work for you?

23          MR. WEINBERG:  He doesn't work for me, and I have

24  employed him for the specific purpose of assisting me in

25  navigating through this bottomless discovery.

1           THE COURT:  Are you court-appointed here?

2           MR. WEINBERG:  No, I'm not, your Honor.

3           THE COURT:  All right, so this is all privately

4    retained.  And so he's got three lawyers, one in Florida,

5    one in Maine, and one in Massachusetts.

6           MR. HEYMANN:  There is also a pending case, a

7    parallel case in the Eastern District of New York, for which

8    there is a separate local counsel.  In that case, Rene

9    Palomino represents the defendant plus a renowned individual

10   named George Farkas.  So there's four attorneys that need to

11   have access to the material.

12          THE COURT:  And so where are you proposing it,

13   since I've got it?

14          MR. HEYMANN:  Okay, to describe the new system,

15   because it was built to try to accommodate both the issues

16   of the quite real risk and also the needs of the defense in

17   preparing, is that each defense counsel, and when they

18   retain a forensic expert, their forensic experts, will get a

19   laptop computer that has 24-hour-a-day, seven-day-a-week

20   access to absolutely all of the electronic discovery

21   evidence.

22          THE COURT:  So out of their office they can get

23   them?

24          MR. HEYMANN:  Out of their office.  All they have

25   to do is have an Internet connection.  You know, the

1   computers will be designed in such a way that they can't

2   store information.  They can't print it, for reasons that

3   I'll describe in a second, but --

4            THE COURT:  They can't store means --

5            MR. HEYMANN:  They won't have a separate -- they

6   can't --

7            THE COURT:  Let's say I'm preparing something, all

8   right, I'm a very visual person, and I see something I think

9   is important, and I want to put an asterisk on it, the

10  equivalent of a yellow sticky, or I want to underline stuff,

11  and then I want to come back to it, does he have the

12  capacity to do that on this machine?

13           MR. HEYMANN:  I'm sure we can design that

14  capacity.

15           THE COURT:  In other words, you've got to let him

16  learn and prepare.  I understood exactly what he said --

17  maybe I'm old-fashioned -- but different folders for

18  cross-examination, for direct.  You need to let him do that.

19  You'll do that.

20           MR. HEYMANN:  By the way, can I take one step

21  ahead, your Honor?

22           THE COURT:  Yes.

23           MR. HEYMANN:  So long as defense counsel was

24  prepared to get a safe in their office in which they would

25  simply store anything they printed out, the government would

1    not object to their -- we have to probably print it out in

2    Pittsburgh, but their having copies on which they could

3    write notes.  It's --

4              THE COURT:  Well, have you told him this?

5              MR. WEINBERG:  No.

6              MR. HEYMANN:  He has objected in the past in his

7    past pleadings to locked facilities.

8              MR. WEINBERG:  That was in the context of the

9    government's prior protective order attempt where they said

10   Mr. Gonzalez couldn't see any of the inculpatory evidence

11   until 30 days before trial, and then only that evidence that

12   Mr. Heymann wanted to use.  Their position was so extreme

13   that I lodged a series of objections.  The problem with this

14   recommendation that I could have things printed in

15   Pittsburgh so that I could keep it in my safe is at least

16   two levels:  One is, you know, I declined the government's

17   offer of evidence that's subject to the government's

18   monitoring.

19             THE COURT:  No, but suppose we did this:  Suppose

20   you could print it, but you had to keep it in the safe in

21   your office.

22             MR. WEINBERG:  I've got no objections to keeping

23   the evidence that I print that is within a category of

24   electronic contraband in a safe.  I've got no desire to

25   disseminate passwords or credit card information.  What I do

Page 12

1    object to is the government having, you know, 25 or 30

2    computers.  They've had them for over a year.

3              THE COURT:  All right, so assume for a minute you

4    can print, and you bear the expense, and you're not under

5    any kind of monitoring, and you keep it in a safe subject to

6    your oath as an attorney, ya-da-da, so does that eliminate

7    your problem?

8              MR. WEINBERG:  It eliminates part of the problem,

9    certainly the problem of my being at current unable to

10   organize my case and review the materials in the fashion

11   I've been doing for 35 years.

12             MR. HEYMANN:  The second part of the --

13             THE COURT:  That doesn't sound, I mean, as if

14   you're so far apart.

15             MR. HEYMANN:  I think the second part of the

16   problem comes with, the government would insist that all

17   notes taken -- there are two other parts.  Now, moving --

18   we've never been terribly far apart on access by defense

19   counsel.  Where we become far apart, your Honor, is the

20   circumstances under which the defendant is allowed to have

21   access to these password and account information --

22             THE COURT:  So distinguishing defendant from

23   defense counsel, because it sounds as if what seems fair

24   here, he's got the laptop.  He can use it.  He can print it.

25   I don't see why the government has to supervise that from

8e420c6b-e9dc-4219-b96b-eee8fe443ddb

1    Pittsburgh.  Now, I do see there's a problem.  I didn't

2    realize there were four or five attorneys, so at some point

3    maybe there would be a central -- are you the central

4    person?

5                MR. WEINBERG:  Well, I'm the central contact for

6    this case, your Honor.

7                THE COURT:  I don't see that we need to have five

8    separate sets being printed out, in other words, that we

9    have one, because then I start feeling as if I'm losing

10   control.  And I know you.  I don't know these other people.

11   He's part of the CJA panel.  He's a well-known member of the

12   Bar here.  I don't know the other folks.  And if the

13   New York judge knows the New York lawyer and blesses that, I

14   don't have a problem with that.  But at least right now, I

15   suppose what we could do is print them out.  You'll be the

16   point person, the person responsible, kept in the safe in

17   your office.  And you can sticky and yellow underline and

18   put in folders to your heart's content, and everything would

19   be subject to an extreme protective order as to who has

20   access.  So I don't think that's so -- and I do understand

21   the concern about having the government know what's being

22   printed.  And besides, you know, it's from Pittsburgh, it's

23   awkward.  Just the whole thing is a transmittal nightmare.

24               So I think the real issue, as you point out, isn't

25   really that.  I think you can probably come to an agreement

Page 14

1    on that.  And why don't we get to who can see it because

2    that strikes me as a bigger issue for you all.  Is that

3    right?

4              MR. HEYMANN:  So as I understand it, your Honor,

5    where we are with respect to defense counsel is that

6    Mr. Weinberg's laptop would have the capacity to print.  It

7    would be stored.  Anything he printed or anything anybody

8    else on the defense team wanted to have printed would be

9    printed by him and stored in a safe.

10             THE COURT:  A list of people who can have access

11   to it.  I don't know about the New York counsel because I

12   don't know the New York case.  Who's the New York judge, the

13   trial judge?

14             MR. HEYMANN:  I'm afraid I just don't remember as

15   I stand here.

16             THE COURT:  You're not the prosecutor down there?

17             MR. HEYMANN:  I'm one of the team that's on that

18   case as well, your Honor.

19             THE COURT:  I don't have serious problem with

20   allowing another court, you know, who blesses another

21   attorney from the New York case, I don't have a serious

22   problem with that.  I do think it's a little bad to have

23   them disbursed to all these different offices.

24             MR. WEINBERG:  I think there's only one other

25   lawyer.  Mr. Farkas in New York is local counsel for

1  Mr. Palomino.  The attorney from Maine works with me, you

2  know, so there's no problem and there's no need for him to

3  have copies.  We would have to address the subject of

4  Mr. Gonzalez's principal counsel in both cases,

5  Mr. Palomino, having some ability to prepare cases --

6          THE COURT:  Well, he can have the laptop.  I'm

7  only talking about the copies.  I think there should be one

8  place for the copies because you want to control that one

9  person, you know, single-point responsibility as to who

10  keeps the copies.

11          MR. WEINBERG:  I accept those responsibilities,

12  certainly have no problem safeguarding the copies in some

13  kind of a master safe and making them accessible to

14  Mr. Palomino when he is in Boston.

15          THE COURT:  Right, and he can look online and

16  et cetera so that you can talk about them.

17          All right, so the big issue is, now, these

18  attorneys, as I understand it, are sitting in their office.

19  So are they allowed -- when he goes to Wyatt -- I understand

20  that's where Mr. Gonzalez is being held, is that right?

21          MR. WEINBERG:  Mr. Gonzalez is in Wyatt, although

22  I would --

23          THE COURT:  All right.  So, now, when he goes to

24  Wyatt, now the question is going to be, let's suppose

25  Gonzalez says, "That's important, that document is

Page 16

1   important," is there a way of him marking that so that he

2   can later go back to his office and print it out?

3           MR. HEYMANN:  I think we're jumping over one step,

4   your Honor, if I may.

5           THE COURT:  Okay.

6           MR. HEYMANN:  Okay, the way the proposed system

7   works with respect to a defendant, where the greatest

8   concerns lie, because, as you, I've been a member of the Bar

9   a long time with Mr. Weinberg, is that the defendant would

10  have access -- the system works by needing to have -- first

11  of all, as a practical matter, the system works by needing

12  to have access to a computer network, and there isn't one

13  for which there's access at Wyatt.

14          THE COURT:  I did jump over a big step, okay.

15          MR. HEYMAN:  Right.  Also, purely as a matter of

16  security --

17          THE COURT:  Excuse me.  You know, for the big mob

18  cases -- I'm old enough to remember -- didn't one of the

19  judges set up a document room where there were computers, or

20  at least they could review documents there?

21          MR. HEYMANN:  The proposal here -- by the way, the

22  amount that we're talking about is far more than would fill

23  up a room if you were trying to print it out.

24          THE COURT:  Like Rapunzel?

25          MR. HEYMANN:  Right, it's from here to the end of

1    the universe kind of documents if you try to print them out.

2           The proposal is to protect it in two different

3    ways:  First of all, if the purpose of the defendant is to

4    assist counsel in preparing for defense, either by

5    explaining documents to him or showing him where to look,

6    then defense counsel ought to be present when the defendant

7    is accessing this stuff.  There is a quite --

8           THE COURT:  So can I try and deal with your first

9    point, which seems almost like a show-stopper to me.  So

10   Mr. Weinberg wants to bring his computer, and Palomino -- is

11   that how you pronounce it?

12          MR. WEINBERG:  Yes.

13          THE COURT:  Like the horse.  All right, so they

14   want to review at least the laptop.  There's no Internet

15   access?

16          MR. HEYMANN:  No.  We've already told defense

17   counsel that we will make a room available without presence

18   of me, obviously, as many times as he wants.

19          THE COURT:  Here in the U.S. Attorney's office?

20          MR. HEYMANN:  In the U.S. Attorney's office,

21   simply because that's physically where --

22          THE COURT:  You're saying at Wyatt there's no

23   Internet?  I don't believe there's anyplace on earth left.

24          MR. HEYMANN:  There is none for the prisoners.

25          MR. WEINBERG:  The answer is that Wyatt has

1    computers, and inmates there, pretrial detainees regularly

2    review electronic evidence on computers without Internet

3    access.  So in the ordinary --

4              THE COURT:  Wi-Fi?  No?

5              MR. WEINBERG:  No, but there are, within Wyatt

6    there are computers with Internet access, and arrangements

7    I'm sure can be made through the legal counsel there, if

8    there was a court directive, for Mr. Gonzalez to have access

9    to a computer with Internet access.

10             THE COURT:  See, what I wouldn't want is that the

11   computer -- I have no problems with you, Marty Weinberg,

12   sitting with him with a laptop going through the documents,

13   in fact, as opposed to in the U.S. Attorney's office.  I

14   start getting nervous when you're not there and he's taking

15   notes and he can make phone calls, given the history here.

16             MR. WEINBERG:  Here's the problem, your Honor.

17             THE COURT:  Excuse me?

18             MR. WEINBERG:  Here's the problem, your Honor.

19   The government has now said there's 15 trillion bytes of

20   information.  And when I go on the computer and Google what

21   is a byte, because I don't know what a byte is, it turns out

22   that it's twice the number of words.  So if you have

23   15 trillion bytes, there's 7.5 trillion words of Rule 16

24   discovery.

25             THE COURT:  Don't we have a paralegal we can pay

1    to sit there with him to go through it all?  I don't want

2    him taking notes that go back into his jail cell.  Just sit

3    down, and just as he's going through them, taking notes on

4    what you should look at.  You can then look at it back.  I

5    understand, your time is too valuable to be spending this

6    kind of time just sitting there as he's scrolling through

7    the documents.  Then you can, with more a refined list, he

8    can just go in and talk to him about it.

9            MR. HEYMANN:  That was my understanding of why

10   Mr. Weinberg hired Mr. Trusiani.

11           MR. WEINBERG:  He is not available.  He's a lawyer

12   and he's an entrepreneur, and he's simply not available.

13           THE COURT:  Do you know how many unemployed

14   lawyers there are right now in the city of Boston?

15           MR. WEINBERG:  There's many.

16           THE COURT:  There's many.  So, I mean, just get

17   somebody of all these people who Ropes & Gray laid off.

18           MR. BUFFONE:  There's none, your Honor.

19           THE COURT:  None.  Deferred, excuse me, deferred.

20   So just to have somebody who -- I don't even care who it

21   is -- just sitting there watching to make sure there aren't

22   any improper notes taken, and --

23           MR. WEINBERG:  I have absolutely no objection to

24   that.  I think that recommendation, if that was --

25           THE COURT:  And then you come back with a more

Page 20

1    focused look, or you can bring him in here and go to the

2    U.S. Attorney's office.  I don't know what's more convenient

3    for you.  Does that make some sense?

4             MR. HEYMANN:  I just want to make sure I

5    understand where we are.  It's the government's position

6    that as long as there's a member of the Bar sitting there

7    with him --

8             THE COURT:  As opposed to a paralegal.  We've got

9    to get refined here.

10            MR. HEYMANN:  I believe as opposed to a paralegal,

11   somebody who has dual obligations to the Court.  This is

12   very sensitive data.  This is insuring that a password and

13   account information that could work its way back out through

14   the system and enable an attack on a major retailer won't

15   get out.

16            THE COURT:  Well, I don't care if it's either a

17   paralegal under the supervision of Mr. Weinberg or

18   Mr. Palomino or this young man, I don't have strong

19   feelings, but there be somebody there with an obligation to

20   a member of the Bar who will make sure there are no notes

21   taken, because as I'm hearing -- that's why I asked what the

22   documents looked like -- unless he's some sort of a genius,

23   which maybe he is, with a photographic memory, you just

24   can't memorize that much.

25            MR. HEYMANN:  It would be terrible for any of us

1    to have our credit card number taken, but that's not what

2    the issue is.  The issue is whether or not a password, an

3    account is memorized, whether the location -- we call them

4    IP addresses -- it looks like a telephone number -- of a

5    computer overseas that contains millions of these things are

6    passed out.  We want to simultaneously insure that the

7    defendant has full opportunity to prepare the defense with

8    his counsel, to advise his counsel, to guide his counsel,

9    but at the same time that we minimize the likelihood that he

10   will --

11             THE COURT:  Sure.  So if we have a paralegal

12   there, no notes, he's sitting in a room, he doesn't get hard

13   copies; and then either here or there, depending on what's

14   more convenient, Mr. Weinberg gets to go in, and the

15   paralegal can somehow or Mr. Trusiani could somehow -- and

16   this is what I don't know the answer to -- like, when I

17   sometimes sit here when I have documents, you can actually

18   create a highlighting on the computer, you know, or a star

19   on the computer, a flag?  Something like that so that then

20   Mr. Weinberg knows what he thinks is significant, can either

21   talk to him on the phone about it or actually meet with him.

22   And that way he's not literally sitting there like a bump on

23   a log at the rates he charges while he's scrolling through.

24   I think that's a good compromise.  But I do have serious

25   problems with him taking any notes or being able to have any

Page 22

1   hard copies.  I think that's just not going to work.  So is

2   there any other access issue?

3          MR. HEYMANN:  No, I don't believe -- putting aside

4   the two issues that we have now put aside, which was the

5   access to --

6          THE COURT:  Yes, obviously the forensic computer

7   person will have to get access, right?

8          MR. HEYMANN:  A forensic person, once candidly we

9   do a criminal records check, will have complete access to

10  all data.  Defense counsel will have access to all data.

11  The defendant, subject to the supervision that the Court has

12  described, I once again urge that it be a counsel, but

13  subject to supervision --

14         THE COURT:  Well, I prefer it to be Trusiani, but

15  if Trusiani is coming down from Maine, it would -- I'd

16  actually prefer it be an attorney as well, but --

17         MR. HEYMANN:  There's lots of local attorneys that

18  could be hired as well.

19         THE COURT:  But it could be hours and hours and

20  hours, and, you know, it's really a big expense.  So to the

21  extent that we can --

22         MR. WEINBERG:  The truth is, it's an unmanageable

23  expense.  This is not a limitless budget.  He is not a

24  corporation.  The government has seized a significant amount

25  of sums.  I've received a modest and fixed fee.  You know,

Page 23

1    I'm prepared to diminish that, you know, if necessary, or I

2    would seek for the Court's discretion for a paralegal or

3    even a lawyer to be appointed under a CJA plan to assist in

4    what I think --

5           THE COURT:  I don't know.  He would have to

6    qualify.

7           MR. WEINBERG:  -- is an extraordinary --

8           MR. HEYMANN:  There are significant issues about

9    the candor of that information that the Court would need to

10   be informed of --

11          THE COURT:  Right, if he wants to apply, he can

12   apply.  But right now, maybe in the beginning Trusiani, see

13   how big a deal it is.  Maybe the first few times have

14   Trusiani do it, and then depending on how big a deal it

15   is -- see, what I can't figure out is, is this just all a

16   red herring?  In other words, that 99.9 percent of this is

17   going to be irrelevant, and it's going to be a few key

18   things?  But he's got to be able to look and see that.

19          MR. WEINBERG:  I think it's even more complicated,

20   and I think it will require an extraordinary amount of his

21   time because, as I understand it, the government is, you

22   know, is packaging the 7.5 trillion words that they say

23   would fill 40 to 60 laptops, almost a fathomless amount of

24   data and information.  The issue to some extent is going to

25   be found in the metadata of the servers:  Did Mr. Gonzalez

Page 24

1    access them?  Did he transfer information to them?

2              THE COURT:  But he won't be able to do that?

3    Would he?

4              MR. WEINBERG:  No.

5              THE COURT:  No, no, that's your forensic person.

6              MR. WEINBERG:  It's really a two-level process.

7    The first level is for him who has computer skills, if even

8    a fraction of what the government claims about him is

9    accurate, to review the evidence.  He's got a constitutional

10   right to review it, and he's got a statutory right.

11             THE COURT:  I understand that, and I agree with

12   you on that.  That having been said, what's really of

13   concern to me is, I have no idea whether he's going to start

14   scrolling through this stuff and it's going to be --

15             MR. WEINBERG:  Well, I think it's going to be --

16             THE COURT:  I don't know what he can find out from

17   that.  In other words --

18             MR. WEINBERG:  I think it's going to be folder by

19   folder, and, you know, some of it -- and I'm glad, without

20   waiving rights to come back to the Court and ask for

21   amendments to the protective order, I think this is a very

22   appropriate way to begin for both my review of the evidence

23   and Mr. Gonzalez's review of the evidence.

24             THE COURT:  Can I just say, I had this in another

25   case.  The kind of analysis you're talking about as to

1    whether he accessed or didn't access, that's something, as I

2    understand, he will not be able to do or see because you

3    have to go into the history, right, with a forensic expert,

4    right?  I've done those in pornography cases.  You have to

5    go -- right?

6            MR. WEINBERG:  Exactly, and, you know, once we get

7    through the first level of review of this mass of materials

8    and can identify what are the pivotal folders or files, or

9    even parts of servers that the government is going to use to

10   try to prove the charges in this case, there will then be a

11   second level, and we will do it -- you know, if Mr. Gonzalez

12   is prevented from doing it because he does have skills, if

13   the government is accurate --

14           THE COURT:  Suppose they have three key folders

15   and says, "This is what the core of our case is," you know,

16   this symbolizes, or he has our strongest three folders that

17   he's accessed, and it shows that he's the one who is the

18   identity thief here, and you had a forensic expert who

19   looked at it and agreed or didn't agree, and he looked at it

20   and agreed or he didn't agree, and then we have a trial, why

21   do we need the gazillion others?  Does it go to sentencing?

22           MR. WEINBERG:  A, it goes to sentencing, if he's

23   convicted; but, B, the government has, and has had for over

24   a year, principal witnesses who the government claims to be

25   Mr. Gonzalez's coconspirators, who upon seizures and

Page 26

1  searches and arrests immediately became cooperating

2  witnesses.  They provided or the government seized their

3  laptops.  They provided passwords which enabled the

4  government --

5              THE COURT:  So it's a way of impeaching those

6  witnesses to show they were the primary actors as opposed to

7  him?

8              MR. WEINBERG:  Yes.  I can't tell how much of the

9  7 -- this 15 trillion -- this 15 terabytes --

10             THE COURT:  I see.  So part of it, not to play it

11 forward, would either be he was a bit player, a byte player,

12 so it might go to both the scope of the conduct and the role

13 that he played; or it could go more fundamentally to guilt

14 or innocence in the sense that he might not have known what

15 was going on.  Is that your basic thing you're exploring?

16             MR. WEINBERG:  Yes, your Honor.

17             THE COURT:  So right now we have the backbone of

18 an agreement, right?  It's just sort of like what make sense

19 to do?

20             MR. HEYMANN:  With respect to the last part, may I

21 suggest that we start, because the government has very real

22 concern about who is insuring that he is not making improper

23 use of the computers, that we start with --

24             THE COURT:  We're going to start with Trusiani.

25             MR. HEYMANN:  -- Trusiani.

1        THE COURT:  And then maybe you look into some sort

2   of a paralegal.  We'll see what the -- I mean, you know,

3   some kid right out of college may not have fortitude, but

4   somebody with more maturity who's got an experience that you

5   can vouch for might.  So why don't we just see what we have.

6   We'll start with Trusiani at the very least.

7        MR. HEYMANN:  And also the frequency.  Thus far,

8   despite the fact that information has been available since

9   February, Mr. Trusiani has only been there twice.  So it

10  depends on how many times --

11       THE COURT:  But, you know, that's why I asked, and

12  not that it should be different if it's publicly retained

13  versus privately.  There's probably not a limitless well,

14  and it's a lot of information.  So let's just start with

15  Trusiani, and then to the extent that you feel like you can

16  hire somebody who's either a paralegal or a younger --

17  somebody ideally better here that you could hire for this

18  purpose here.  There's thousands of young law graduates who

19  probably could use the work, and they can just sit there and

20  watch and would love learning from someone like you, I mean,

21  seriously, I mean, just somebody like that.

22       And I need to get to TJX in a minute.  I haven't

23  forgotten you.  So are there any other problems?

24       MR. WEINBERG:  Yes, your Honor.

25       THE COURT:  Okay.

1          MR. WEINBERG:  There's the threshold problem of

2     Paragraph 10 of the draft protective order where the

3     government says they may monitor and log electronically all

4     usage of the CCAP, and I am --

5          THE COURT:  I thought that isn't the case now that

6     you can print out, right?

7          MR. WEINBERG:  Well, it is the case.  The

8     government wants to have the mechanism, whether it's

9     internalized in this Pittsburgh-created electronic database

10    or whether it's external --

11         THE COURT:  So, in other words, there's a

12    possibility, every time you printed, there could be a --

13         MR. WEINBERG:  Every time I access a part of their

14    database, they want to track my accessing it and have it

15    available to the government in the event that they believe

16    they want to look at it, and that's a simply unacceptable

17    tracking --

18         MR. HEYMANN:  No, that's not fair.  That's not

19    fair at all.  This is what the concern is, your Honor.

20         MR. WEINBERG:  Let me just read, if I may, the

21    paragraph.  It says, "The government may monitor and log

22    electronically all usage of the CCAP for security purposes."

23    They then list three people who shall not be told the

24    materials viewed by the defense or defense counsel, being

25    Mr. Heymann, his co-counsel in New York, a DOJ attorney

Page 29

1    named Peretti, and Mr. Gammons who's sitting there.  But

2    other than those three people, Mr. Heymann has drafted a

3    protective order that lets anyone else in the government

4    for, quote, "security purposes" track my work product, track

5    what I access.

6           THE COURT:  Is there a way of -- so what do you

7    intend to do with this provision?

8           MR. HEYMANN:  We intend to do nothing with it

9    absent there being an intrusion into another retailer,

10   additional damage to a bank, one of the victims whose data

11   and passwords and location information and vulnerabilities

12   are in these computer systems.  If there were another

13   intrusion, we would want to be able to find out whether or

14   not the defendant had gotten access to that information

15   again and disseminated it.  It's a mechanism to insure that

16   if he's looking at something, it's for a legitimate purpose,

17   and that it does not work its --

18          THE COURT:  So what happens?  So let's say --

19          MR. HEYMANN:  It just sits there.  Absent a

20   problem, it just sits there like Raiders of The Lost Ark.

21          THE COURT:  It doesn't actually say that, though,

22   in the protective order.  Suppose the defendant is sitting

23   in his jail cell and he clicks on a page, opens a file --

24   what's the right word? -- he opens a file, so this computer

25   in Carnegie Mellon logs that, right?

8e420c6b-e9dc-4219-b96b-eee8fe443ddb

1          MR. HEYMANN:  Yes.  It stores a file that says

2     this computer accessed this piece of information on that

3     date, and it just sits there unless somebody goes and looks

4     at it.

5          THE COURT:  So can we block it separately so it's

6     separate, so instead of going to an attorney's mental

7     impressions and work product, we just kept that information

8     when the defendant went into something?  And then you just

9     kept it, and no one would have access to it unless I

10    authorized it?

11         MR. HEYMANN:  Let me check, your Honor.  I think

12    the way that would happen is, we'd end up getting another

13    separate laptop which was identified in the computer system

14    and therefore --

15         THE COURT:  So if the defendant accessed, opened a

16    file, at least theoretically the way this would work is, the

17    computer would somehow record that.  That would be retained,

18    like a Title III wiretap, subject to court order.  I

19    wouldn't allow anyone into it unless there was a request.

20         MR. HEYMANN:  That would be fine.

21         MR. WEINBERG:  Respectfully, your Honor,

22    Mr. Gonzalez is not being provided a computer.  Were he

23    provided a computer --

24         THE COURT:  I thought that's what was going to be

25    brought into the jail.

1          MR. WEINBERG:  In the presence of a paralegal or

2     in the presence of a lawyer, he will be able to, you know,

3     work his way through the evidence, but not if he's aware

4     that if anything, if any human being on the planet -- you

5     know, and there are many -- he's not the only one who's

6     alleged to have hacked into corporate computers -- if anyone

7     on the planet happens to hack into a store, a credit card

8     company, a financial institution, that suddenly the

9     government is going to be able to go to Pittsburgh and track

10    my work product?

11         THE COURT:  I don't know.  I'm not so upset about

12    that as long as it comes with, I have to be the one to

13    authorize it.  In other words, they can't do what you just

14    said unless I find that there's good cause to believe that

15    there was some nexus.

16         MR. WEINBERG:  Would that be subject to a probable

17    cause requirement?

18         THE COURT:  Yes, yes.  Maybe reasonable suspicion,

19    I mean, maybe reasonable suspicion.  I mean, I don't know, I

20    haven't thought about that.  It's a good point.  But

21    basically I would have a hearing, and just if there's any --

22    the concern I have is that theoretically, anyway, he could

23    see a site, and either through communications with someone

24    at the prison get it out, or otherwise just be able to

25    memorize it, if there's some key site.  I don't know enough

8e420c6b-e9dc-4219-b96b-eee8fe443ddb

Page 32

1   about it.  There's no way he can memorize the whole pool of

2   information.  I mean, God, he'd be a genius that we should

3   all emulate.  But I think if we do this, if there's a way

4   that the computer -- no one gets access without court

5   authority and without a hearing, I think that that should be

6   able to protect him.

7             MR. WEINBERG:  So as I understand it, there will

8   be a fifth computer that will be given to me for the use of

9   people that are traveling to Wyatt, or if Mr. Gonzalez comes

10  to Boston, who would review this fifth laptop, and that

11  there will be no logging or monitoring in Pittsburgh or

12  anywhere else in the universe from the lawyer of CCAP.

13            THE COURT:  As far as I'm concerned, that's

14  correct because that is monitoring your mental impressions

15  and work product as opposed to -- and, you know, we're all

16  talking about risks here, risk control, the risk of you

17  inadvertently giving him something which he sends out.  And

18  I suppose there's some risk, but it's not as bad as him

19  sitting there and saying, "This is what I need," and writing

20  it down on a note and then getting it out to someone or

21  memorizing it.

22            MR. WEINBERG:  Can I step back for a moment, your

23  Honor, because Mr. Heymann has thrown out a whole bunch of

24  hypothetical risks.  This man is sitting in Wyatt.  He's got

25  tape-recorded access to the phones.  He's got no Internet,

Page 33

1    except if the Court directs it and we can arrange it through

2    the legal counsel.  Let me just finish before -- you know,

3    he's sitting there with -- if Mr. Heymann successfully

4    prosecutes him, we start at a life guideline, and he would

5    know that any violation of a protective order -- and he

6    would be required to sign a protective order and know what

7    his obligations under it are, and they can include not

8    disseminating any evidence that he sees as part of pretrial

9    discovery -- he'd be destroying his life.  He's a

10   27-year-old man, if convicted, facing a life guideline

11   subject to the Court's discretion.  He'd be facing an

12   obstruction of justice.  He'd be facing -- essentially he'd

13   be self-destructing.  We've written before in bail

14   decisions, including the First Circuit's decision in

15   Patriarca, that we rely on some informed self-interest.  His

16   self-interest is obeying the rules of the court.  It's not

17   in destroying that.

18            THE COURT:  I understand that, but I don't see

19   that there's a serious problem here as long as no one can

20   get at it with respect to him.  So what's the next issue?

21            MR. WEINBERG:  Well, do I understand that

22   Mr. Heymann can assure the lawyers that the CCAP and the

23   Pittsburgh creators does not internally provide a monitoring

24   device?

25            THE COURT:  He doesn't even know if they can do it

1    yet.  He's going to get back to me.

2             MR. HEYMANN:  The goal here is to set up a

3    system -- I have to speak to the experts -- the goal here is

4    to set up a system where there will be one computer that is

5    designated for use by the defendant.  That activity on that

6    computer will be logged, and that access to that log will be

7    limited to circumstances under which the Court directs.

8             THE COURT:  Like I unseal it essentially.

9             MR. HEYMANN:  Like you unseal it, but the Court

10   has to direct access to the contents of that log.  We say

11   the contents in case there's a mechanical issue.

12            MR. WEINBERG:  And that would be with prior notice

13   to Mr. Gonzalez's counsel?

14            THE COURT:  Yes.

15            MR. WEINBERG:  And subject to it with not a

16   probable cause requirement, I would request a probable cause

17   requirement.

18            THE COURT:  I don't know yet because this is an

19   investigation where the reasonable suspicion might be

20   enough, the equivalent of a Terry.  I don't know, but we'll

21   talk about that later.  The key is, though, it has to come

22   back to me.

23            MR. WEINBERG:  And it would have to be Chinese

24   walled from the prosecution.

25            THE COURT:  Yes, yes, I agree.  Okay, what's the

1    next issue?  I know that there's the one computer that we

2    talked about at side bar.

3              MR. HEYMANN:  I think there remains two issues,

4    your Honor.  The first is, it's actually a computer and a

5    hard drive, but there are two storage devices, as it were,

6    seized from the defendant that are separately an issue and

7    separately of greatly heightened concern.  And there's also

8    the separate issue for which TJX has asked to be heard,

9    which is that there are a series of forensic reports that

10   were prepared, not at the government's request but were

11   prepared at victims' requests like TJX, like BJ's Wholesale,

12   in which an outsider came in and says, "This is what

13   happened to you.  These are the changes you ought to make

14   going forward, and by way of background, this is the network

15   architecture."  And what they're concerned about is -- what

16   I'm concerned about is, I need to show that to an expert

17   both to tell me whether there's --

18             THE COURT:  Have you done that yet?

19             MR. HEYMANN:  None of this has happened yet.  I

20   mean, the report has been prepared by the third party, but

21   there has been no disclosure to defense counsel and no --

22   it's before the Court at this point to determine the

23   circumstances.

24             THE COURT:  But you haven't seen them either?

25             MR. HEYMANN:  I -- yes, I have.  I have seen them.

Page 36

1    I mean, I've read --

2              THE COURT:  But you haven't shared them with your

3    experts?

4              MR. HEYMANN:  I have not shared them with my

5    experts.  I received them during the course of the criminal

6    investigation.

7              THE COURT:  Okay, so let's deal first with the

8    computer that was seized from him, and there were certain

9    discussions that we had at side bar about it.  So you want

10   it, is that what the issue is?

11             MR. WEINBERG:  Yes, your Honor.  He's got both a

12   constitutional and a statutory right to see his own -- for

13   the defendant personally to review his own written

14   statements.  Included in his computer are chat logs that are

15   the instantaneous e-mail logs of his own written words to

16   various people.

17             THE COURT:  Now, have you looked at them?

18             MR. HEYMANN:  I have had described to me the

19   important contents, which I'm prepared to go forward with

20   the Court with unless defense counsel objects at this point.

21             MR. WEINBERG:  Well, I do.  I think this ought to

22   be a matter that we address --

23             THE COURT:  But can I just say, why can't he see

24   them?  They're his statements.

25             MR. HEYMANN:  First of all, your Honor --

Page 37

1        MR. WEINBERG:  And if Mr. Heymann is going to

2   relate the content, I would ask that it be done on a

3   confidential basis.

4        THE COURT:  Yes, I don't need to hear the content

5   now, but you can't use them?  Is that the --

6        MR. HEYMANN:  First of all, we can't use them.  By

7   agreement with defense counsel for the reasons we discussed

8   at side bar, this is nothing we can use.  We can't use it,

9   introduce it as evidence, so this isn't being produced for

10  the purpose of --

11       THE COURT:  Why wouldn't the procedure we've set

12  up actually protect with respect to this other computer as

13  well?

14       MR. HEYMANN:  Because what is on this --

15       THE COURT:  And in this computer, we'll have the

16  lawyer sitting there under any circumstances.

17       MR. HEYMANN:  This computer was the defendant's --

18  these two computers were the defendant's war machines.  This

19  is --

20       THE COURT:  No doubt, but in some ways doesn't

21  that make them more essential for him to be able to see?

22       MR. HEYMANN:  They contain information --

23       THE COURT:  And if he uses them, you might be able

24  to counter use them under the doctrine of completeness, I

25  mean, but --

Page 38

1          MR. HEYMANN:  They contain, your Honor, without

2     going into the specifics, as defense counsel has requested

3     at this point --

4          THE COURT:  I'm assuming they've got a lot of --

5          MR. HEYMANN:  It's the most dangerous materials in

6     discovery, okay?

7          THE COURT:  All right, so it doesn't mean he

8     doesn't see them.  It may mean that there's a heightened --

9     maybe this is the computer that should be seen only in the

10    U.S. Attorney's office, but it doesn't mean he doesn't get

11    to see them.  He gets to see it.  Now, if there's a

12    heightened level of scrutiny or security, that may be.  I

13    don't know enough about it, but you can't say he can't see

14    it.

15         MR. HEYMANN:  There is no reason, your Honor, the

16    defendant needs to see it.

17         THE COURT:  You know what?  He gets to see it.

18    Now, maybe this is something that it is worth having

19    Mr. Weinberg, whom I know -- I don't know these other

20    people -- sitting in your office.  Maybe this is the

21    computer that should be done in a heightened level.  I

22    understand your heightened level of concern, I'm totally

23    sympathetic to it, as opposed to all this other stuff where

24    I worry that the risk is small.  You've paid all this money,

25    so just figure out a protocol that he can use in your

Page 39

1    office.

2              MR. HEYMANN:  At a minimum, your Honor, this is an

3    occasion that Mr. Weinberg ought to be personally present

4    because --

5              THE COURT:  I completely agree.

6              MR. HEYMANN:  -- there is no basis other than

7    preparation for defense.

8              THE COURT:  I agree.

9              MR. WEINBERG:  I agree too.

10             THE COURT:  Okay, all right.  So you're going to

11   have to recraft this protective order.  So this will take

12   place in the U.S. Attorney's office with Mr. Weinberg

13   present and the defendant present.  That makes some sense.

14             Now, there's another issue with respect to the

15   third-party protocol, so maybe I can hear at this point from

16   TJX.  Come on up.

17             MR. BUFFONE:  Thank you, your Honor.  Where would

18   you prefer that I stand a this point?

19             THE COURT:  That's fine.

20             MR. BUFFONE:  Your Honor, my name is Samuel

21   Buffone, and, first, I appreciate the Court granting me

22   pro hac vice leave to appear today, and I appear today on

23   behalf of the TJX Corporation.  I'll try and be as brief as

24   possible because I appreciate the complexity of the issues

25   the Court is addressing.

1       TJX has two principal interests at stake here,

2   your Honor, and I'd like to clarify what they are.  First,

3   among these huge mass of credit card data that's been

4   discussed this morning, it is not only the numbers on the

5   credit card, your Honor, but a significant portion we've

6   been led to understand of this credit card data has what's

7   called Track 2 data attached to it.  Track 2 data is the

8   personal identifying information.  It's not just the number

9   on the credit card in my wallet.  It's my name, my home

10  address, personal identifying information.

11       THE COURT:  This is on the bulk of the information

12  that he'd be seeing.  Have you seen any of it?

13       MR. BUFFONE:  Yes, I have, your Honor.  I don't

14  know I'd say the bulk of it.  I'd say, you know, it's a

15  significant amount of it, enough for there to be a concern.

16  So TJX has concern over the personal privacy information of

17  customers who shopped in its stores, and revealing that

18  information during the course of discovery we believe would

19  be a revictimization, not only of TJX but of the individual

20  cardholders whose accounts were exposed.

21       THE COURT:  As I understand it, it's private

22  information, right, as one would understand private

23  information in the sense of financial information?

24       MR. BUFFONE:  Personal privacy information, your

25  Honor, anything that would reveal the identity and other

Page 41

1    information about the cardholder.

2          THE COURT:  If he's just looking at it, and he

3    can't take notes on it, and it's only -- he's got to go

4    through these files just to see what a defense could

5    possibly be.  He's not going to be able to recopy or print

6    hard copies, the defendant himself.

7          MR. BUFFONE:  Well, your Honor, let me move

8    forward to that.

9          THE COURT:  Are you a criminal lawyer?

10          MR. BUFFONE:  Yes.  As Mr. Weinberg I think will

11   tell you, I'm often on this side of the table.

12          THE COURT:  Here's my concern:  They've got to be

13   able to at least look at it and see what they need.  I will

14   not allow any of this to be publicly put on the Internet or

15   exposed during a court proceeding, to the extent we have a

16   trial or whatever, but how do you propose I operate?  I

17   mean, I don't know what I can do.

18          MR. BUFFONE:  Well, your Honor, let me get to the

19   point of my --

20          THE COURT:  I understand your third-party reports.

21   That's a whole different level of the forensic reports into

22   your computer system, so I don't know what else to do.

23          MR. BUFFONE:  I'll get to those in a moment, your

24   Honor, but just if I can just --

25          THE COURT:  I hate to say he can't look at it.

Page 42

1   You know that.

2           MR. BUFFONE:  I appreciate that, your Honor.  If I

3   could just zero in on this, I think our concern at this

4   point from what we've heard this morning is that, without

5   accepting the allegations of the indictment, I think we

6   could all agree that Mr. Gonzalez is a very sophisticated,

7   knowledgeable computer user.  This just isn't someone who

8   occasionally logs in to read e-mails.  We're going to be

9   giving this person access to the Internet.  Now, granted,

10  there's going to be a paralegal or an attorney sitting there

11  with him, but we have to have a high level of confidence.

12          THE COURT:  I had thought we weren't giving him

13  general access to the Internet.  I thought he was just going

14  to be getting access to these documents.

15          MR. BUFFONE:  Well, I don't know if that's

16  possible, your Honor.  He's going to have Internet access to

17  CERT at Carnegie Mellon so that he can have access to the

18  database there.  This gentleman with all his sophisticated

19  knowledge is going to be sitting in a computer terminal --

20          THE COURT:  I'm going to have this attorney

21  sitting there or maybe somebody whom we all bless as a

22  sophisticated paralegal type.

23          MR. BUFFONE:  Well, your Honor, we're talking

24  about attorneys who, as I understand it, aren't skilled in

25  computer technology.

1      THE COURT:  They're going to know that he's

2   looking at this as opposed -- I mean, I don't know, he's not

3   going to be shopping in Amazon.

4      MR. BUFFONE:  I don't think he's going to be

5   shopping at Amazon, your Honor, but a number of key strokes

6   that someone didn't know what he was doing could provide

7   access to that database.  So when we get to this issue of is

8   there going --

9      THE COURT:  Provide access to what database?

10      MR. BUFFONE:  The database that's held at CERT.

11   What we have at Carnegie Mellon is a database with all this

12   Track 2 information in it.

13      THE COURT:  Excuse me.  I'm not sure that a

14   younger person wouldn't be more computer savvy than

15   Mr. Weinberg, with all due respect to Mr. Weinberg.  He's,

16   I'm assuming, about my age.  So at the end of the day, we're

17   going to have a lawyer monitoring this.  I understand your

18   concern.  I certainly understand your concern, but I wonder

19   whether the risk is a little tiny if we're having a guy

20   sitting there watching whatever he's doing from their

21   defense team.

22      MR. BUFFONE:  Your Honor, I have the real-world

23   solution to this.  All I'm suggesting is that the protective

24   order be drafted so that there is a physical impossibility

25   to access over the Internet anything other than the database

Page 44

1    at CERT.

2          THE COURT:  To the extent feasible.  That sounds

3    like a good idea if it's feasible.

4          MR. HEYMANN:  That certainly is the goal.

5          THE COURT:  That's the goal, so why don't you two

6    talk.  Maybe your computer people can help him do that.

7          All right, so now let's get to this report because

8    I haven't seen these reports.

9          MR. BUFFONE:  Yes, your Honor.  I'd like to

10   expand.  There's more than a report.  As I believe

11   Mr. Heymann will attest, TJX has cooperated throughout with

12   the government and the Secret Service investigation, I mean,

13   the U.S. Attorney's office and the Secret Service

14   investigation.  So it's not just the forensic reports that

15   Mr. Heymann is discussing, but we essentially had to tell

16   them everything about our computer system so that they could

17   conduct their investigation.  So all of this information

18   about what is a very complex proprietary computer system,

19   how TJX processes credit cards, the architecture of the

20   system, the passwords, the routing of the information, is

21   all important information that if it were known to anyone

22   outside TJX could expose it to further hacks and further

23   intrusions.

24          THE COURT:  So let me just divide this into three

25   parts, if you will.  Okay, the first is who gets access to

1   your report, if anyone.

2            MR. BUFFONE:  Yes, your Honor.

3            THE COURT:  The second would be whether or not --

4   the government now has had access, so once we give access to

5   one side, whether I've got to give it to the other side.  I

6   didn't realize until today that you've already had access to

7   it, so how do I then refuse access?  And the third is

8   whether there's some partial compromise.  In other words,

9   obviously he's not going to get -- you could redact all the

10  stuff about what to do in the future, how to make it safe in

11  the future, all right, so that comes out.  And what I would

12  want to know is if in fact the description of the way the

13  computer system used to be is harmful to you, as I'm

14  assuming you've taken all these safeguards, or most of them.

15           MR. BUFFONE:  Your Honor, I think that's a problem

16  for us, in that while we have taken significant safeguards

17  that weren't present at the time of the intrusion and there

18  have been substantial changes in the system, there are

19  certain aspects of it that remain the same.  They remain the

20  same of necessity because there's only a certain way that

21  credit card transactions can be processed.  We didn't take

22  down the whole system and build it from the ground up again.

23           THE COURT:  Are there things that remain the same,

24  though, so commonplace and commonly known that it's not a

25  danger?  See, I don't really feel as if this piece of it has

1    been vetted well for me to see if there's a

2    Solomonic solution here.  I mean, quite clearly, the stuff

3    that you've done for the future should not be disclosed.

4    The way it was in the past, I don't know if it's just TJX or

5    all these places.

6            MR. HEYMANN:  May I suggest, your Honor, that part

7    of the great concern here -- and I don't want to speak for

8    TJX here but certainly from my perspective --

9            THE COURT:  How many victims are there?

10           MR. HEYMANN:  Dozens, a number of reports --

11           THE COURT:  So this may not be the only -- this

12   may be a more general problem.

13           MR. BUFFONE:  Correct, your Honor.

14           MR. HEYMANN:  The number of reports are probably

15   half dozen, but there are dozens.  There is a difference

16   between whether or not Marty Weinberg will have an

17   opportunity to review it and determine whether or not or the

18   forensic expert --

19           THE COURT:  Has he seen it yet himself?

20           MR. HEYMANN:  No.  Nothing's been -- we've been

21   waiting for the Court's ruling on the forensic report.

22           THE COURT:  Can I make a suggestion?  Would it be

23   to start off not giving the defendant himself access to

24   this, but at least start off with Mr. Weinberg and his

25   expert looking at it to see whether it's even worth anything

Page 47

1  to them?

2          MR. BUFFONE:  First, your Honor, we understand

3  there is no expert, but putting that aside for a moment,

4  yes, that is the problem.  We don't want --

5          THE COURT:  Well, at some point -- he doesn't know

6  this stuff -- he's going to have to hire an expert.  I mean,

7  he's going to have to hire somebody.  The government must

8  have an expert, right?  You usually have an in-house person?

9          MR. HEYMANN:  Yes, your Honor.

10          THE COURT:  Who do you have?

11          MR. HEYMANN:  We have -- who do we have?  We have

12  a network expert at Carnegie Mellon.

13          THE COURT:  So has he looked at these reports?

14          MR. HEYMANN:  Not yet, pending, again, the ruling

15  of the Court.

16          THE COURT:  Because, see, the problem I run

17  into --

18          MR. HEYMANN:  The only person who's seen them is

19  me.

20          THE COURT:  To the extent that -- maybe you know

21  all this stuff, a generation younger, but, in any event, to

22  the extent your expert relies on it, they have a right to

23  see it.  So already we've got that basic issue.  Are you

24  planning on showing it to your expert?

25          MR. HEYMANN:  Yes, your Honor, because I'm

1    concerned that my technical sophistication is not high

2    enough to separate whether or not there is something in that

3    report that is inconsistent with my expert's views; and if

4    it were inconsistent, it would create disclosure

5    obligations.  It's a catch-22.

6            THE COURT:  So as soon as your expert sees it, his

7    expert sees it.  That's the catch-22 we're into.  So before

8    you show it to him, understand that.  So at the very least,

9    you need to refine it down not as to future changes -- we

10   don't want anyone to be seeing that -- but with respect to

11   the way it was in the past.  Now, let me ask you, with

12   respect to the way it was in the past, you would have to

13   actually explain it more to me and maybe give me some

14   affidavits as to why the past configuration would create a

15   problem for you if it were being shown to counsel or

16   experts.

17           MR. BUFFONE:  Your Honor, I'd be happy to do that,

18   but if I could explain --

19           THE COURT:  But let me be clear:  Once it's shown

20   to the government -- you know, you've done criminal law --

21   it's got to be shown to his side.

22           MR. BUFFONE:  I think your Honor has identified

23   the two issues.  Our concern is, of course we would want

24   reasonable controls over defense counsel having access to

25   this material, but our real concern is Mr. Gonzalez.  And

1    the reason is, I think your Honor was quite correct in

2    saying that, you know, unless he has a world-class

3    photographic memory, he's not going to take back to his

4    prison cell and record in his memory the names and

5    identification and credit card numbers.  But a few select

6    pieces of information about the architecture of TJX's

7    system, a few select pieces of information about how

8    information is routed, IP addresses --

9            THE COURT:  Well, this might be the kind of thing

10   that just 30 days beforehand or something, pick a number,

11   60, where if it gets that far and really it turns out to be

12   relevant and necessary; but until then it could be for

13   counsel and expert's eyes only, and this might be something

14   that might qualify.  But I don't feel as if I know enough

15   yet about it.  You haven't even seen it yet, right?

16           MR. WEINBERG:  A, I've not seen it.  B, I don't

17   understand the Track 2 data has the addresses of credit card

18   holders.  C, TJX since January of '07 has been aware of the

19   security breach, and that's the latest date.  That's the

20   date they announced of their awareness.  And, D,

21   Mr. Gonzalez, if the government allegations are correct,

22   already knows, you know, about the TJX past security system.

23   I think it is important that they're a fact witness as well

24   as an expert witness; that if these reports from TJX are

25   from factual witnesses who will be testifying to a breach of

1    TJX, I need them not only for Daubert challenges to Carnegie

2    Mellon experts, I need them so that I can begin to --

3              THE COURT:  Well, I feel as if this one issue

4    hasn't played out well enough for me to balance, so maybe we

5    could brief this one a little separately.  But for the time

6    being, at least -- the government has just proffered that it

7    will be showing at least parts of the report to its expert,

8    so for the time being, if you decide that's true after

9    consulting, then that piece needs to be shown to

10   Mr. Weinberg's expert, and that it will just right now be

11   for attorney's eyes only and expert eyes only.  To the

12   extent you feel like you need to share it with Mr. Gonzalez,

13   maybe we could create also something, a narrower window.

14   Maybe you can make a showing as to why you need it and that

15   sort of thing, and we could have a separate hearing or have

16   Judge Bowler do it or something like that.

17             Now, a thought occurred to me also.  I just want

18   to mention it.  Ropes & Gray does my estate and tax work to

19   the private clients.

20             MR. WEINBERG:  We have no objection, your Honor.

21             THE COURT:  Think about it, talk about it.  You

22   know, there's like a business, I forget what it is, a

23   private services group that I'm Chinese walled off.  And I

24   actually didn't even think of it until I saw you standing

25   here for the motion to intervene as to whether I should

1    officially allow it or not.  The law does permit me to allow

2    it, but as a victim, I think you have a right to be heard

3    about it.  That having been said, this is a criminal case

4    and he's entitled to a lot.  So at some point you might want

5    to -- I have no stockholdings in TJX, but the second thought

6    hit me, if you say there are dozens of victims, this is a

7    gray area, whether I have any financial -- you might want to

8    tell me who they are just to make sure I have no financial

9    holdings in them.  I'm just coming to this case now.

10           MR. HEYMANN:  Right.  Your Honor, we filed

11   pursuant to local Rule 12, I think it is, the list of nine

12   victims.

13           THE COURT:  So I should take a look at that, all

14   right.

15           MR. HEYMANN:  And to some extent, they're owned by

16   parents and their subsidiaries.  Those are of record in this

17   proceeding.

18           THE COURT:  Okay, good.

19           MR. WEINBERG:  And, secondly, I would object to

20   Ropes & Gray and TJX intervening.  I have no objection to

21   their providing factual information that the Court might

22   feel is important.

23           THE COURT:  Well, because they're parties as

24   well -- excuse me -- they might be witnesses as well as

25   victims and it's in the early stage, at this point I'm

Page 52

1    denying it without prejudice, but as victims, I believe

2    strongly they have the right to --

3              MR. WEINBERG:  And the statute says at plea, at

4    sentencing.

5              THE COURT:  So if they need to come in again on

6    their very unique, that third-party report, I may well allow

7    it, so --

8              MR. WEINBERG:  I would just ask, your Honor, that

9    the intervention be consistent with 3771.  There's a

10    statutory ambit for when victims can participate in

11    hearings.

12              THE COURT:  Let me just say, there are two issues

13    here.  One is, as a victim, they are always able to be

14    heard, but there's a second line of cases that they've cited

15    to me for privileged documents.  Now, these aren't

16    technically privileged, but they are private.  So I don't

17    know whether that line of cases goes.  To the extent that

18    there is a private forensic report that they object to my

19    showing, I would be inclined to allow them to intervene if

20    they wanted to appeal it as a collateral order.  So that's

21    really the only difference, right, the only thing that

22    would --

23              MR. BUFFONE:  That's correct, your Honor.  We

24    would need standing to appeal unless we were appealing under

25    the mandamus provisions of the Victim Rights Act.

1      THE COURT:  Because I did look.  I didn't have as

2  much time as I had wanted, but there is a line of cases that

3  allows that for privileged material and then an immediate

4  right to appeal if I disclose privileged matter.

5      MR. WEINBERG:  It's almost always when neither of

6  the parties is representing the interests of the requested

7  intervenor, although I do understand and agree that if the

8  Court was to make an order, that Mr. Buffone would need some

9  standing in order to appeal that, even if Mr. Heymann was

10  advocating --

11      THE COURT:  Right, so I don't know that at this

12  point we're there yet because the heartland issue that we've

13  talked about I haven't ruled on yet.  So let me put it this

14  way:  Are you going to fight giving the -- did you -- I

15  don't know if this is lawful for me to ask, so if it's

16  unlawful, object.  Did you turn over that report voluntarily

17  or pursuant to some sort of a subpoena?

18      MR. HEYMANN:  Your Honor, I think I can actually

19  answer that more generally.  In some cases it was one, I

20  believe, and in other cases it was -- we have several

21  reports, not just those from TJX.  In many cases they were

22  voluntary.  I think in some it was pursuant to a subpoena.

23  I don't recall as I stand here.

24      THE COURT:  You don't recall?  I don't know if

25  that has legal significance.

1    MR. BUFFONE:  Your Honor, I don't want to get into

2    any 6(e) problems here, but, you know, I'm happy to with the

3    consent of the parties make a representation as to what we

4    produced pursuant to subpoena and what we produced

5    voluntarily.

6    MR. HEYMANN:  I don't think it's relevant here,

7    but I do --

8    THE COURT:  I don't know.  I mean, I'm thinking

9    out loud, if someone voluntarily turned over some reports as

10   opposed to under compulsion.

11   MR. WEINBERG:  I think it's highly relevant given

12   the kind of -- the way the court system is addressing

13   selective waiver, that I understand TJX has been cooperating

14   with the government.

15   THE COURT:  I don't know.

16   MR. WEINBERG:  And to the extent they disclosed

17   what they're now claiming is privileged, they've waived that

18   privilege as to the defendant.

19   THE COURT:  But I still have to take into account

20   all these people with their credit card numbers, which I

21   think I've done.  But the unique issue is the extent to

22   which TJX has to disclose its full computer system to

23   somebody who may have --

24   MR. HEYMANN:  I do think we're several steps -- I

25   do, as the Court stated, I think we're several steps away

1      right now on this very sort of narrow set of things.

2              THE COURT:  Yes, I don't need to do that other

3      than I need to get -- can I talk about the more macro issue?

4      You're going to go out, you're going to try and devise a

5      protective order.  To the extent that there are differences

6      of opinion as to what we said, maybe you put yours in

7      brackets and you in parentheses, and I'll just rule.  We've

8      just got to jump start this because he's been in jail a

9      really long time at this point, and we need to get this case

10     moving.  Based on what you know, when would you like a trial

11     date?

12             MR. WEINBERG:  Judge, I don't want to sound

13     irrational, but I think there is such a magnitude of --

14     almost unprecedented magnitude of evidence to review that

15     I'm not even prepared to ask the Court for a motion date.  I

16     would ask the Court for a status conference in three months.

17             THE COURT:  No, I want to work -- I want to

18     work -- it's an old case.  It's an '08 case, and so it must

19     be at least what?  At least --

20             MR. HEYMANN:  It was indicted in the beginning of

21     August, 2008, and the defendant made his --

22             THE COURT:  That's not that old actually.  I

23     mean --

24             MR. HEYMANN:  No.  And then I forget when the

25     defendant made his initial appearance.  It was about four to

Page 56

1    six weeks later.

2         THE COURT:  So what I'd like to do is pick a date.

3    And I receive many motions for continuances, but at least it

4    gives us a target to work backwards from.  He's been sitting

5    in Wyatt, which is not ideal, for a very long time.  You've

6    looked through this material.  What do you think?  You know,

7    somebody -- you've looked through the volume, or maybe your

8    agent has.  What will it take?  Let's say he's looking at

9    this stuff every day for three weeks.  How much of it would

10   he even get through?

11        MR. HEYMANN:  If there were a concerted effort on

12   behalf of the defense, I would think that there would be a

13   meaningful review of what needs to be reviewed in three

14   months, plus --

15        THE COURT:  All right, so, let's see, your thought

16   would be three months.

17        MR. HEYMANN:  To review the evidence, yes.

18        THE COURT:  That's just the --

19        MR. HEYMANN:  I mean, the actual evidence itself

20   would be a week, but assuming that he wanted to go through

21   the whole body of --

22        THE COURT:  Have you turned over to them what it

23   is you're relying on?

24        MR. HEYMANN:  I'm trying to get to that, but I've

25   actually been working on dealing with all the rest of

1    discovery issues.  A lot of that has been turned over --

2          THE COURT:  Maybe that's the way to work.  So when

3    could you get to him what you're relying on as the core of

4    your case?

5          MR. HEYMANN:  A lot of it has been turned over.  I

6    would say a month from now, six weeks from now?  That's the

7    core of the case, but that's --

8          THE COURT:  Yes, I understand that.  I'm not going

9    to preclude you from that.  Just so they know there's a

10   focus.  It sounds like this is huge.  So it's May 11 right

11   now.  Could you get it to him by June 11?

12         MR. HEYMANN:  Could we say the end of June?  I

13   guess July 1.

14         THE COURT:  July 1.  Fair enough?

15         MR. HEYMANN:  Uh-huh.

16         THE COURT:  So you get to him the core of your

17   stuff.  Meanwhile, you're going to start this process of

18   going through this stuff.

19         MR. WEINBERG:  We don't even -- the government

20   will not even provide us with this electronic Carnegie

21   Mellon discovery, it sounds like, for two more months.

22         THE COURT:  Why?

23         MR. HEYMANN:  There are two problems.  I think I

24   spoke too quickly in a couple of regards.  The first is, we

25   have ordered all the equipment, but it will take about six

1   weeks from now to get the equipment in, to get everything

2   up, to get the, as it were, the material --

3           THE COURT:  Well, let's just say July 1 we'll make

4   it.  You give them the core of what you're doing by July 1.

5           MR. HEYMANN:  My concern is twofold, your Honor.

6   The first is that there are a variety of things that are

7   offshore that we're going to have to decide whether or not

8   we're bringing in people, witnesses, how that material is

9   going to come in.

10          THE COURT:  Listen, listen, I'm not precluding you

11  from supplementing.  I just want what you've got -- you

12  indicted based on something -- so there's a focus on this.

13  So what you've got by July 1, and then you can supplement as

14  you go, so he has someplace to start.  And, you know, you

15  could supplement as much as you want, but just what you've

16  got now, what you've gone with.  So when can you get him the

17  Carnegie Mellon data room or computer --

18          MR. HEYMANN:  I'd have to speak -- I mean, my best

19  estimate is six weeks from now.

20          THE COURT:  July 1.

21          MR. HEYMANN:  July 1.

22          THE COURT:  Fine, okay.  Now, assuming --

23          MR. HEYMANN:  That's my best -- I mean, again,

24  it's out of my control in that regard, but --

25          THE COURT:  So July 1.  It's huge, and he's been

1   sitting in jail a long time.  Assume for a minute, once he

2   gets them -- Mr. Weinberg probably has no idea how long it's

3   going to take because he hasn't seen any of it, so let's

4   even build in -- and you can move for a continuance -- three

5   months of continuous access.  He's doing nothing else.

6   Every day he's going to sit and go through them, and we're

7   going to build in three months.  And so that's August,

8   September -- by October 1 we'll assume that -- and it could

9   go faster because he's the one who's sitting there in jail,

10  all right.  So let's say October 1, you've been able to sit

11  down and gone through a major doc review with him.  And then

12  we have a status conference so that you know what you're

13  talking about in terms of, like, what's there.  Are there

14  dispositive motions that are about to happen?

15          MR. WEINBERG:  No, your Honor.  There's been no

16  motion date.  We have maybe a fifth conference with

17  Magistrate Judge Bowler in --

18          THE CLERK:  September 10.

19          MR. WEINBERG:  September 10.

20          THE COURT:  That's perfect.  So if I see you in

21  early October, you will have met with her.  I will know what

22  dispositive motions are coming.

23          MR. WEINBERG:  Yes.

24          THE COURT:  You will have gotten a solid chunk of

25  the discovery, if not all of it, out of the way, and we can

Page 60

1    just see what's left, because my goal would be to try this

2    case, let's say, next January.

3              MR. WEINBERG:  It's going to be difficult.  I've

4    got November and December trials, and Mr. Gonzalez is

5    scheduled for his New York trial -- is it November?

6              MR. HEYMANN:  September 14.

7              THE COURT:  Well, how are they moving more quickly

8    than I am?  Now you've got my competitive juices going.  Is

9    it a smaller case?

10             MR. WEINBERG:  A, it's a smaller case; B, it's the

11   first indicted case; and, C, there was discovery that was

12   provided to Mr. Gonzalez that is not at the magnitude of the

13   discovery that Mr. Heymann is relying on.  That case is

14   subject to a motion to continue to the extent that this

15   discovery impacts that preparation.

16             THE COURT:  Well, what I'd like to do is have you

17   first out after New Year's with one week so that you can

18   enjoy New Year's.  So ideally speaking -- when's New Year's?

19   Is it a Tuesday?  What is it?

20             THE CLERK:  New Year's Day is a Friday.

21             THE COURT:  Friday, okay, good.  So do you want to

22   do it the 4th, or do you want to do it the 11th?

23             MR. WEINBERG:  By doing it, do you mean the trial?

24             THE COURT:  Yes, the 11th.

25             MR. WEINBERG:  Could I ask the Court to consider a

1   February or March date?  I do have these November and

2   December trials.  This is a case that's demanding in terms

3   of preparation.

4            MR. HEYMANN:  Your Honor, if we're going to move

5   the trial date back, I'd like with the Court's permission to

6   move the date -- I'm pushing extraordinarily hard to get the

7   evidence together in that six-week period.  If he wants

8   additional time in which to --

9            THE COURT:  What do you want?  When do you want a

10  trial date?

11           MR. HEYMANN:  I would be fine with January 4 or

12  whatever the Court just described.  I think moving the case

13  to trial is a very good --

14           THE COURT:  At this point we're going to start

15  with the 11th, and we're going to pencil in the beginning of

16  February.  So if his cases actually go the full month of

17  December, we're going to have -- I just want both dates on

18  your calendar because I don't trust dates because they

19  always get continued and --

20           MR. WEINBERG:  I understand.

21           THE COURT:  So we'll start with the 11th, and then

22  if that's what it is --

23           MR. HEYMANN:  As a buffer to --

24           THE COURT:  And pencil in, what's the first week

25  in February in case there's a problem?  What I don't want is

Page 62

1    the November-December cases to get bumped, and then I lose

2    you into March and April.

3              MR. WEINBERG:  Understood, your Honor.  My first

4    2010 commitment.

5              THE COURT:  Yes.

6              MR. HEYMANN:  And as a buffer both to

7    getting the -- it's called the CPAC -- I don't know, a fancy

8    name -- up and my having with some confidence the materials

9    for Mr. Weinberg, can we make those both July 15 rather than

10   July 1, since we're moving the trial date back?

11             THE COURT:  Sure, July 15 is fine.  But let me

12   just say this:  This case has been sitting for a while, and

13   I know various things were happening under the radar screen,

14   but we've really got to put -- it's possible that maybe

15   there would be an alternative disposition after the New York

16   result, maybe, who knows, I don't know, but I've got to

17   assume right now we're going forward to trial.  I've just

18   got to assume that.

19             MR. HEYMANN:  The defendants elected to go to

20   trial, and we are proceeding as expeditiously as we can

21   along those ways.  My main concern is trying to get the

22   discovery in motion, the discover order in motion, as well

23   as identifying the evidence, but that's --

24             THE COURT:  So we're going to have all those

25   dates, and July 15 we are going to meet on a status

Page 63

1    conference, Robert, the first week in October.  I am willing

2    to move it more quickly, if we can, but otherwise I'm going

3    to exclude all time until January 11 under the Speedy Trial

4    Act.  But I am worried.  It's long, it's a long spinout that

5    he's sitting.  So I'm happy to move as quickly as defense

6    counsel wants me to.

7            MR. WEINBERG:  Thank you, your Honor, and we

8    certainly have no objection to the Court's excluding the

9    time between now and January 8.  This has already been

10   denominated a case of complexity under the Speedy Trial Act.

11           THE COURT:  Sure.  But what I'd like is, how long

12   do you think to draft a protective order so I can at least

13   get this in place?

14           MR. HEYMANN:  By the end of the week, your Honor.

15   Just if I can take two minutes of the Court's time to just

16   make sure I have --

17           THE COURT:  He's going to read you the dates, so,

18   Robert, when --

19           MR. HEYMANN:  Oh, no, that I have the various

20   components --

21           THE COURT:  Why don't you order a transcript.

22           MR. HEYMANN:  Oh, okay.

23           THE COURT:  That's probably the safest thing

24   because I'm not sure I'd even remember at this point.  We

25   went through a lot of stuff.

1    MR. WEINBERG:  That would be great.  And could I

2  ask the Court, there's one area that I am both concerned

3  about and unclear about, and that is the extent to which the

4  government is going to provide at first level the forensic

5  reports, whether privately authored or authored by the

6  government to counsel.

7    THE COURT:  Well, have you authored it?  Have you

8  got one yet?

9    MR. HEYMANN:  There are preliminary forensic

10  reports that we have no objection to producing subject to

11  all of the other constraints; you know, subject to the

12  protective order that we've now described today.

13    THE COURT:  Right, and at this point I have not

14  ordered that the third-party reports of --

15    MR. HEYMANN:  It's just the third-party ones that

16  are separate.

17    THE COURT:  Yes, the TJX or any of the other

18  victims of this scheme, I'm not ordering that they be

19  produced right now, but what I am ordering is that all the

20  government's reports be produced, subject to the protective

21  order.

22    MR. WEINBERG:  And I would ask the Court to

23  reconsider that and to permit counsel to see the third-party

24  forensic reports redacted, at least, of future --

25    THE COURT:  Well, that's what you're all going to

1    talk about, and then we're going to vet it some more.  So to

2    the extent that there turns out to be a dispute on that,

3    that is one area where I might allow some intervention and

4    fight.  But what I'm hoping is, there's going to be a

5    compromise, which is:  The future stuff is deleted.  The

6    past stuff the government relies on will be produced.  And

7    that's the piece that I think, by law, if your experts

8    relied on them, has got to be turned over.  But if it is,

9    I'm hoping the compromise is, right now it's just to you and

10   counsel and your forensic expert, and I'll worry about the

11   defendant much down the road.

12           MR. WEINBERG:  Understood, it's without waiving my

13   right to come back to court to seek further disclosure.

14           THE COURT:  Yes, yes, so I'm hoping you'll work

15   out a compromise here, but --

16           MR. WEINBERG:  I would ask the Court --

17           THE COURT:  But if there isn't, then I will allow

18   you to intervene to challenge that because that is uniquely

19   your work product.

20           MR. BUFFONE:  Thank you, your Honor.

21           MR. WEINBERG:  I just want to put two legal

22   positions on the record.  One is, to the extent this wasn't

23   compelled but it was voluntarily produced, I believe the

24   third parties have waived privilege.  And, second of all, I

25   believe they're producible, not just as expert reports but

1   as documents material to the defense and related to fact

2   witnesses who may become relevant in this case.

3           THE COURT:  Well, see, I don't even know yet

4   whether they will be fact witnesses.  That's why I felt like

5   I'm not far enough down the road, and I'd like to wait as

6   far as defendant goes way down the road as to whether in

7   fact it is Jencks material or Brady material, that kind of

8   thing, and I don't think I feel I know enough.

9           Have you been notifying -- is TJX playing some

10  sort of lead in this, or would the other twelve like to be

11  heard from?  Do you know?

12          MR. BUFFONE:  Your Honor, we've had notification

13  pursuant to the standard victim notification notices that

14  would go out to any victim, and so we're only here asserting

15  TJX's interest.  We've had no other contact with any of the

16  other victims that might be on that system.

17          MR. HEYMANN:  And they're the only ones who

18  contacted my office, your Honor.

19          THE COURT:  To the extent that you can go back to

20  your office and find the name of the federal judge who's

21  handling the New York case, it would be useful for me to

22  know who that is to coordinate some of this.

23          MR. HEYMANN:  I'll send it to your clerk.

24          THE COURT:  Because that's moving much more

25  quickly.  I don't know what they've done that I haven't

Page 67

1    done.  You say it's a much smaller case?

2             MR. HEYMANN:  Well, first of all, that one was

3    indicted in May, so it's four months ahead of this one.  It

4    involved one victim as opposed to what is at the heart of

5    this one, eight or nine victims.  And to date, unlike this

6    case, there have been no motions that I'm aware of filed or

7    very little litigation in that one as opposed to this one.

8             THE COURT:  You're saying Palomino represents him

9    there, is that it?

10            MR. HEYMANN:  Yes.

11            THE COURT:  Who's the victim in the New York case?

12            MR. HEYMANN:  Dave & Buster's Restaurant chain.

13            THE COURT:  Well known here in New England.  So is

14   that an alleged victim in this case?

15            MR. HEYMANN:  No, your Honor.

16            THE COURT:  All right, so there's not going to be

17   so much overlap?

18            MR. HEYMANN:  There is an evidentiary overlap for

19   about half of the case.

20            THE COURT:  Because what I could envision

21   happening, just to make sure, is I don't want to be slowed

22   up with this because I could well imagine for the

23   overlapping case, there will be a request for transcripts on

24   both sides.  So we need a little bit of a gap in between the

25   two cases, right?  If there are witnesses testifying and

1    they're overlapping witnesses, I've got to assume

2    Mr. Weinberg is going to at least want to read that, if not

3    have a copy, and you will too, right?

4              MR. HEYMANN:  I'm sorry, I missed the question.

5              THE COURT:  In other words, most of the time, if

6    there are similar witnesses, overlapping witnesses for a

7    similar kind of conspiracy, you'll both want to read the

8    transcripts of the key witnesses.

9              MR. HEYMANN:  The factual basis for -- well --

10             THE COURT:  I don't know enough about the case to

11   know whether what I just said is true, but if it is, we need

12   a certain period of time in between the two trials.

13             MR. HEYMANN:  I don't anticipate -- that's why

14   it's underscored that there's a September 14 trial date and

15   now a January 4 trial date.  I don't anticipate a motion to

16   transfer the case from New York to here.  There are already

17   separate counsel lined up there and --

18             THE COURT:  How about the other way around?

19   Anyway, thank you very much.

20             MR. HEYMANN:  Thank you, your Honor.

21             MR. WEINBERG:  Thank you, your Honor.

22             THE COURT:  And in two weeks you'll, or by the end

23   of this week, ideally, you'll get me a proposed protective

24   order, and, ideally speaking, there's nothing confidential

25   about it.  TJX would be at least notified and be able to

1    comment on that process.

2              MR. HEYMANN:  Yes, your Honor.

3              MR. WEINBERG:  Thank you, your Honor.

4              MR. BUFFONE:  Thank you, your Honor.

5              THE CLERK:  Court is in recess.

6              (Adjourned, 11:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8e420c6b-e9dc-4219-b96b-eee8fe443ddb

Page 70

1                C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 70 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in

11  Criminal No. 08-10223-PBS, United States of America V.

12  Albert Gonzalez, and thereafter by me reduced to typewriting

13  and is a true and accurate record of the proceedings.

14          In witness whereof I have hereunto set my hand

15  this 14th day of May, 2009.

16

17

18

19

20

            /s/ Lee A. Marzilli
21          _____

            LEE A. MARZILLI, CRR
22          OFFICIAL COURT REPORTER

23

24

25