1    MR. WEINBERG: Every time I access a part of their
2 database, they want to track my accessing it and have it
3 available to the government in the event that they believe
4 they want to look at it, and that's a simply unacceptable
5 tracking --
6    MR. HEYMANN: No, that's not fair. That's not
7 fair at all. This is what the concern is, your Honor.
8    MR. WEINBERG: Let me just read, if I may, the
9 paragraph. It says, "The government may monitor and log
10 electronically all usage of the CCAP for security purposes."
11 They then list three people who shall not be told the
12 materials viewed by the defense or defense counsel, being
13 Mr. Heymann, his co-counsel in New York, a DOJ attorney
14 named Peretti, and Mr. Gammons who's sitting there. But
15 other than those three people, Mr. Heymann has drafted a
16 protective order that lets anyone else in the government
17 for, quote, "security purposes" track my work product, track
18 what I access.
19    THE COURT: Is there a way of -- so what do you
20 intend to do with this provision?
21    MR. HEYMANN: We intend to do nothing with it
22 absent there being an intrusion into another retailer,
23 additional damage to a bank, one of the victims whose data
24 and passwords and location information and vulnerabilities
25 are in these computer systems. If there were another

1  intrusion, we would want to be able to find out whether or
2  not the defendant had gotten access to that information
3  again and disseminated it.  It's a mechanism to insure that
4  if he's looking at something, it's for a legitimate purpose,
5  and that it does not work its --
6              THE COURT:  So what happens?  So let's say --
7              MR. HEYMANN:  It just sits there.  Absent a
8  problem, it just sits there like Raiders of The Lost Ark.
9              THE COURT:  It doesn't actually say that, though,
10 in the protective order.  Suppose the defendant is sitting
11 in his jail cell and he clicks on a page, opens a file --
12 what's the right word? -- he opens a file, so this computer
13 in Carnegie Mellon logs that, right?
14             MR. HEYMANN:  Yes.  It stores a file that says
15 this computer accessed this piece of information on that
16 date, and it just sits there unless somebody goes and looks
17 at it.
18             THE COURT:  So can we block it separately so it's
19 separate, so instead of going to an attorney's mental
20 impressions and work product, we just kept that information
21 when the defendant went into something?  And then you just
22 kept it, and no one would have access to it unless I
23 authorized it?
24             MR. HEYMANN:  Let me check, your Honor. I think
25 the way that would happen is, we'd end up getting another

1  separate laptop which was identified in the computer system
2  and therefore --
3              THE COURT: So if the defendant accessed, opened a
4  file, at least theoretically the way this would work is, the
5  computer would somehow record that.  That would be retained,
6  like a Title III wiretap, subject to court order.  I
7  wouldn't allow anyone into it unless there was a request.
8              MR. HEYMANN: That would be fine.
9              MR. WEINBERG: Respectfully, your Honor,
10 Mr. Gonzalez is not being provided a computer.  Were he
11 provided a computer --
12             THE COURT: I thought that's what was going to be
13 brought into the jail.
14             MR. WEINBERG: In the presence of a paralegal or
15 in the presence of a lawyer, he will be able to, you know,
16 work his way through the evidence, but not if he's aware
17 that if anything, if any human being on the planet -- you
18 know, and there are many -- he's not the only one who's
19 alleged to have hacked into corporate computers -- if anyone
20 on the planet happens to hack into a store, a credit card
21 company, a financial institution, that suddenly the
22 government is going to be able to go to Pittsburgh and track
23 my work product?
24             THE COURT: I don't know.  I'm not so upset about
25 that as long as it comes with, I have to be the one to

1  authorize it.  In other words, they can't do what you just
2  said unless I find that there's good cause to believe that
3  there was some nexus.
4          MR. WEINBERG:  Would that be subject to a probable
5  cause requirement?
6          THE COURT:  Yes, yes.  Maybe reasonable suspicion,
7  I mean, maybe reasonable suspicion.  I mean, I don't know, I
8  haven't thought about that.  It's a good point.  But
9  basically I would have a hearing, and just if there's any --
10 the concern I have is that theoretically, anyway, he could
11 see a site, and either through communications with someone
12 at the prison get it out, or otherwise just be able to
13 memorize it, if there's some key site.  I don't know enough
14 about it.  There's no way he can memorize the whole pool of
15 information.  I mean, God, he'd be a genius that we should
16 all emulate.  But I think if we do this, if there's a way
17 that the computer -- no one gets access without court
18 authority and without a hearing, I think that that should be
19 able to protect him.
20         MR. WEINBERG:  So as I understand it, there will
21 be a fifth computer that will be given to me for the use of
22 people that are traveling to Wyatt, or if Mr. Gonzalez comes
23 to Boston, who would review this fifth laptop, and that
24 there will be no logging or monitoring in Pittsburgh or
25 anywhere else in the universe from the lawyer of CCAP.

cbbf9e43-2710-4136-a893-7b35c86edc96

1      THE COURT: As far as I'm concerned, that's
2 correct because that is monitoring your mental impressions
3 and work product as opposed to -- and, you know, we're all
4 talking about risks here, risk control, the risk of you
5 inadvertently giving him something which he sends out. And
6 I suppose there's some risk, but it's not as bad as him
7 sitting there and saying, "This is what I need," and writing
8 it down on a note and then getting it out to someone or
9 memorizing it.
10     MR. WEINBERG: Can I step back for a moment, your
11 Honor, because Mr. Heymann has thrown out a whole bunch of
12 hypothetical risks. This man is sitting in Wyatt. He's got
13 tape-recorded access to the phones. He's got no Internet,
14 except if the Court directs it and we can arrange it through
15 the legal counsel. Let me just finish before -- you know,
16 he's sitting there with -- if Mr. Heymann successfully
17 prosecutes him, we start at a life guideline, and he would
18 know that any violation of a protective order -- and he
19 would be required to sign a protective order and know what
20 his obligations under it are, and they can include not
21 disseminating any evidence that he sees as part of pretrial
22 discovery -- he'd be destroying his life. He's a
23 27-year-old man, if convicted, facing a life guideline
24 subject to the Court's discretion. He'd be facing an
25 obstruction of justice. He'd be facing -- essentially he'd

1  be self-destructing.  We've written before in bail
2  decisions, including the First Circuit's decision in
3  Patriarca, that we rely on some informed self-interest.  His
4  self-interest is obeying the rules of the court.  It's not
5  in destroying that.
6            THE COURT:  I understand that, but I don't see
7  that there's a serious problem here as long as no one can
8  get at it with respect to him.  So what's the next issue?
9            MR. WEINBERG:  Well, do I understand that
10 Mr. Heymann can assure the lawyers that the CCAP and the
11 Pittsburgh creators does not internally provide a monitoring
12 device?
13           THE COURT:  He doesn't even know if they can do it
14 yet.  He's going to get back to me.
15           MR. HEYMANN:  The goal here is to set up a
16 system -- I have to speak to the experts -- the goal here is
17 to set up a system where there will be one computer that is
18 designated for use by the defendant.  That activity on that
19 computer will be logged, and that access to that log will be
20 limited to circumstances under which the Court directs.
21           THE COURT:  Like I unseal it essentially.
22           MR. HEYMANN:  Like you unseal it, but the Court
23 has to direct access to the contents of that log.  We say
24 the contents in case there's a mechanical issue.
25           MR. WEINBERG:  And that would be with prior notice

cbbf9e43-2710-4136-a893-7b35c86edc96

1  to Mr. Gonzalez's counsel?

2          THE COURT: Yes.

3          MR. WEINBERG: And subject to it with not a
4  probable cause requirement, I would request a probable cause
5  requirement.

6          THE COURT: I don't know yet because this is an
7  investigation where the reasonable suspicion might be
8  enough, the equivalent of a Terry. I don't know, but we'll
9  talk about that later. The key is, though, it has to come
10 back to me.

11         MR. WEINBERG: And it would have to be Chinese
12 walled from the prosecution.

13         THE COURT: Yes, yes, I agree. Okay, what's the
14 next issue? I know that there's the one computer that we
15 talked about at side bar.

16         MR. HEYMANN: I think there remains two issues,
17 your Honor. The first is, it's actually a computer and a
18 hard drive, but there are two storage devices, as it were,
19 seized from the defendant that are separately an issue and
20 separately of greatly heightened concern. And there's also
21 the separate issue for which TJX has asked to be heard,
22 which is that there are a series of forensic reports that
23 were prepared, not at the government's request but were
24 prepared at victims' requests like TJX, like BJ's Wholesale,
25 in which an outsider came in and says, "This is what