<u>**REDACTED**</u>
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.   )<br>)<br>ALBERT GONZALEZ,   )<br>)<br>Defendant.   )<br>) | Nos. 08-CR-10223-PBS<br>08-CR-10262-PBS |

**SENTENCING MEMORANDUM OF ALBERT GONZALEZ**

**I.   INTRODUCTION.**

On September 11, 2009, defendant Albert Gonzalez pled guilty, pursuant to a plea agreement, to all nineteen counts of the indictment against him, which charged him with violations of 18 U.S.C. §371, 1028A, 1029(a)(3), 1029(c)(1)(C), 1030(a)(5)(A)(i), 1343 and sought forfeiture of $1.6 million, as well as other assets. In the plea agreement, made pursuant to Fed. R. Crim. P. 11(c)(1)(C), Gonzalez and the United States agreed to a sentence range of 15-25 years. The purpose of this memorandum is to urge upon the Court reasons why a sentence of fifteen years is "sufficient, but not greater than necessary" to serve the purposes of sentencing, 18 U.S.C. §3553(a).

In the wake of *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), this Court has a substantial measure of discretion in fashioning an individualized sentence for Albert Gonzalez under §3553(a). *See, e.g., United States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008)("The Court's decision in *Gall*, combined with its decisions in *Kimbrough* . . . and *Rita v. United States*, [551 U.S. 228] (2007), makes clear that in the post-*Booker* world, district judges

are empowered with considerable discretion in sentencing...."); *United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008)(district court has "broader freedom than it did before *Kimbrough*"); *United States v. Rodriguez*, 527 F.3d 221, 225 (1st Cir. 2008)("In *Gall*, ... the Justices expounded further on a district court's authority to vary from the guidelines, emphasizing that district courts have wide latitude in making individualized sentencing determinations"); *United States v. Politano*, 522 F.3d 69, 73 (1st Cir.)("In view of the Supreme Court's recent decision in *Gall*, we emphasize that the broad discretion afforded to the district court is paramount"), *cert. denied*, 129 S.Ct. 133 (2008); *United States v. Martin*, 520 F.3d 87, 90 (1st Cir. 2008)("*Gall* makes clear that courts of appeals must grant district courts wide latitude in making individualized sentencing determinations"); *see also United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008)(affirming sentence which court had twice previously vacated in light of *Gall*'s broader definition of the deference given to district judges' sentencing decisions). For the reasons addressed herein, Gonzalez urges the Court to exercise that discretion to impose a 15-year sentence on Gonzalez.

## II. A SENTENCE OF 15 YEARS IS SUFFICIENT TO SERVE THE §3553(a) PURPOSES OF SENTENCING.

### A. [REDACTED]

### B. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.[1]

Albert Gonzalez is a young man possessed of a singular talent: his remarkable computer skills. He has, to be sure, used that talent – born of an obsession developed during his boyhood, practically from the time he obtained his own computer – for unlawful purposes, as well as lawful purposes. Since his incarceration, he has for the first time been separated from computers and the

---

[1] The discussion in this section is a distillation of information contained in the PSR and in the letters written on Gonzalez' behalf, as well as of information obtained from Barry H. Roth, M.D. who evaluated Gonzalez and whose report accompanies this Memorandum.

2

internet, and with that separation, and the corresponding freedom to think about his life and his past offenses, has come the recognition that he misused his skills in ways that caused substantial harm. He has done everything in his power to rectify the wrongs he has done, to voluntarily disgorge his ill-gotten assets, and to make a profound and clear break from the past.

To understand why Gonzalez is worthy of another chance requires an exploration of how he came to be where he is, what drove him further and further into computer crime, and where he is today after 20 months without access to a computer. This is by no means an attempt to excuse his crimes – Gonzalez blames no one but himself – but is instead an effort to elucidate both his past and his present and thereby, Gonzalez hopes, to provide necessary background for the crimes that he committed and his susceptibility to rehabilitation. Under §3553(a), the "history and characteristics" of the defendant are an important consideration in the fashioning of a sentence which is sufficient, but not greater than necessary, to serve the purposes of sentencing.

As a young boy, Gonzalez was an outwardly normal enough kid – he had friends, engaged in activities, worked alongside his father, received good grades in school, and was part of a warm and loving family which continues to stand by him. In middle school, things began to change, and by high school Gonzalez had become a different person – a loner, without friends, who passed up normal teenage activities, including dating, to devote himself to his new-found and rapidly escalating obsession: computers. As his mother described in her letter to the Court:

> *Over time he changed from a talker to silent and reserved and not very communicative.* He was entering high school and he started to like computers. It was a world he wanted to discover, and he felt that he could do it. He would spend his time playing car racing and wrestling games. *I saw that he was focused only on computers.* As time went on, I observed that he was not only playing racing games and talking with friends on line; since I didn't know about computers, I would ask him and he would give me a flippant answer. I became vigilant and thought about taking him for psychological evaluation, *because it was already like an obsessive vice.*

3

> One day I spoke with him about taking him to a psychologist and he said, "No, I am not crazy." I explained to him that you didn't have to be crazy to go to a psychologist, but he kept refusing and said that if I took him he wasn't going to talk to the psychologist, that he would just stay quiet. The people I spoke to about this told me that computers are a part of today's youth, and that now they are all sitting at computers for as much time as they can.

Letter of Maria Gonzalez (emphasis added). *See* PSR ¶¶115, 122. Gonzalez' sister had similar observations:

> His fascination for computers started at an early age. I remember Albert and me working summers with our father where we would receive an allowance for helping him. Albert saved his money and decided to buy a computer. He was fascinated by this new technology. No one in the house knew how to use this thing, yet Albert tore it apart and put it back together with no help at all. This escalated into helping out the neighbors or setting up computers for my parents' friends. He did this always at no cost because he just enjoyed doing it. Then in high school he bought himself a HUGE programming book (C or C++) and learned a programming language on his own. He would sit in the computer for hours at a time. He went from being an extroverted and talkative kid to quiet, introverted, and obsessed with the computer. His grades in high school deteriorated as well. Instead of doing homework, he would just be on the computer all the time. I remembered my parents worried and my mom mentioned taking him to a psychologist and changing schools, but he refused. Everyone thought what he was going through was a phase, and I even thought well it's better to be obsessed with a computer than getting into drugs. When he was able to go out with his friends, he opted to go to a local mall with other computer involved people which apparently he had met through chat rooms.

Letter of Frances Gonzalez Lago.

Seeking to break Gonzalez of his computer habit, his mother periodically sought to deny him access to his computer or to at least curtail his usage, once putting it in his sister's room. Rather than be deprived of access to his computer, Gonzalez would go to his sister's room in the middle of the night to use it. Gonzalez's social contacts narrowed to computer chat rooms where he communicated with others with knowledge of computers and to meetings of other computer-savvy individuals, many of whom were hackers and from whom he learned much that he would, unfortunately, later convert to unlawful purposes. To this day, Gonzalez' mother blames herself and agonizes over what she and her husband might have done differently had they understood the compulsive pull that

computers were to have on their son's life. *See* Letter of Maria Gonzalez ("That lack of action on my part weighed heavily on me, and will weigh heavily on me for the rest of my life"). Gonzalez does not, however, blame his family, and acknowledges that the fault is all his own. Gonzalez' teenage fascination with computers and the internet, his obsession with them, and his single-minded focus on mastering their intricacies, rather than being confined to productive ends, instead led him on a path which, tragically, ended in a federal prison.

After he graduated from high school, Gonzalez enrolled in Miami Dade Junior College, hoping to obtain a computer-related degree. He dropped out of college in the first semester because his grades were bad and because he had already taught himself so much about computers that he found his computer courses pedestrian and uninteresting. His employment endeavors thereafter were ultimately unsuccessful, although through no fault of his own. He first obtained work at a dot.com company in New York City, but lost his job when the company went out of business. He then worked for Siemens for a year but left when the company relocated to Pennsylvania. Gonzalez found himself unemployed, and by that time – early 2002 – Gonzalez, age 21, had developed a serious drug and alcohol problem, *see* PSR ¶¶126-130, which played a substantial role in the subsequent course of his life.[2] This is not to say that his substance abuse affected Gonzalez' ability to tell right from wrong. It did not, and he knew when he turned to cyber-crime that it was wrong. What it did do, however, was contribute to his inability to stop himself. What developed over time was a destructive cycle of using drugs to permit him to stay awake and alert for long hours at the computer

---

[2] One of the most striking things which Gonzalez has discovered since his incarceration is how much clearer his thinking is without the effects of alcohol, drugs, and computers. Gonzalez is now able to acknowledge that he would benefit from a drug/alcohol abuse program and hopes to spend some of his time in prison making his drinking and drug use a thing of the past so that the same problems do not recur after his release. It is noteworthy that he now frequently expresses his relief that he is away from computers and their deleterious effects on his life.

but also using them to try to get away from the computer, particularly after he began to think that he should stop what he was doing. Even a 2003 arrest and subsequent cooperation with the Secret Service could not break his deeply entrenched patterns.[3]

Gonzalez' failure (or inability) to stop his criminal behavior is intimately tied to the role which his computer expertise (and computers themselves) played in his life. Computers, and what he could do with them, had become the center of his life, his raison-d'être, if you will.[4] He and his computers in many ways became one: he thought in computer-speak instead of normal words, and, when his computer was infected by a virus, referred to the event as if it were he, himself, who had gotten the virus. This was his one area of expertise and his only source of self-validation; he relished the feeling of achievement each time he made another break-through and accomplished something

---

[3] In the view of Gonzalez' sister, Gonzalez' avoidance of prison through his prior work with the Secret Service seemed like a reward for his knowledge of computers. *See* Letter of Frances Gonzalez Lago. "All this seemed okay at the time, but psychologically it was feeding an obsession that in the end would become my brother's downfall." *Id.*

[4] While computer/internet addiction has not yet been officially recognized as a DSM diagnosis, efforts have been underway to define and provide diagnostic criteria for computer/internet addiction. One of the leaders in this effort has been Jerald J. Block, M.D., who has identified four components of the disorder: "(1) *excessive use*, often associated with a loss of sense of time or neglect of basic drives, (2) *withdrawal*, including feelings of anger, tension, and/or depression when the computer is inaccessible, (3) *tolerance*, including the need for better computer equipment, more software, or more hours of use, (4) *negative repercussions*, including arguments, lying, poor achievement, social isolation, and fatigue." Jerald J. Block, *Issues for DSM-5: Internet Addiction*, 165 Am. J. Psychiatry 306-37 (March 2008)(emphasis in original), submitted herewith as Exhibit A. Among the research noted by Dr. Block was that conducted in China and South Korea. A copy of a Chinese research paper on internet addiction is submitted as Exhibit B. Gonzalez displays all the noted criteria for internet addiction, as Dr. Roth, an addiction specialist, concludes in his report:

> Mr. Gonzalez meets criteria for Internet Addiction, synergized by (– neither explained or excused by) substance abuse. Mr. Gonzalez could not control his compulsion and obsession with computers and the internet. Nor was he able to master the tasks of childhood and young adult development to achieve and maintain healthy self regard through his welcome contributions to society. He tried to stop and redirect himself, and could not.

Roth Report at 5. Dr. Roth's report, along with his CV, is submitted herewith as Exhibit C.

complex and difficult through his computers, which gave him a sense of self-worth and self-esteem that he had found nowhere else in his life. *See* Letter of Frances Gonzalez Lago ("Everyone knew he had a special talent and he loved that because it made him feel secure, like he was worth something"). Unfortunately, this only drove him deeper and deeper into the criminal path on which he had embarked. As Dr. Roth noted:

> The structure and nature of his mental processes included extreme aptitudes that were the means of his undoing when he used them [for] ill gain and wrong achievement. At the same time, catastrophic social lacks, failures, and weaknesses pushed him into gratification and snares (his misdeeds) which he could neither resist, nor pull himself out of once caught in their grips.

Roth Report at 2.[5]

> His social awkwardness, lack of friends, pervasive criticism from early childhood onwards and the way he developed and applied his enormous machinelike aptitude for machines, in his search for recognition all operated together to condition and determine his self-defeating and uncontrollable behaviors destined to produce only one possible outcome: the compulsive criminal behavior that inevitably lead to his capture and punishment.

*Id.* at 5.[6]

Perhaps the most important thing to understand about Gonzalez' crimes is that the motivation for them was predominantly the thrill of accomplishing more and more difficult computer feats and not just personal greed. In addition, because of his single-minded focus on his computer and his interpersonal defects and the fact that those he harmed were faceless (as were many of the others who worked in association with him and whom he only knew by their web names), Gonzalez was,

---

[5] Notably, Dr. Roth made findings and conclusions about Gonzalez with "medical certainty" which were, to him, "stunning and unexpected," given the strong negative bias with which he had approached the task. Roth Report at 2.

[6] Tragically, although they did their best, his family and school personnel treated his computer fixation as a serious problem rather that a skill to be channeled to appropriate uses. Consequently, "he experienced his extraordinary computer machine and information technology aptitude as something that others regarded as a curse. The one thing he deeply felt precious and himself brought him harsh words and criticism." Roth Report at 3.

7

during the time when he was committing his crimes, unable to appreciate the harm he was doing to others. Now that he has had time to reflect on his crimes, his mind freed from the tyranny of computers and drugs and alcohol, he understands the sense of violation that the consumers whose credit card numbers were stolen (an on some occasions used) must have felt and is truly remorseful.

Since his incarceration, Gonzalez has finally been able to think clearly about his computer crimes and why he committed them. This reflection has led him to genuine remorse and a determination to leave that part of his past behind him and start over again, this time along a lawful trajectory. As Dr. Roth found:

> Even now, Mr. Gonzalez continues a childlike way of seeking fairness, admitting his faults, accepting responsibility, showing remorse, and trying to learn and grow. He has remorse and regret. He has admitted wrongdoing and accepted responsibility. He is willing and able to rehabilitate.
>
> He criticizes his past notorious illegal activities. He does not make excuses. He does not blame others. He is not defensive, evasive or unwilling to look at hard questions about himself and what he has done. He labels what he has done as morally wrong.

Roth Report at 2.

> There is a remarkable consistency in the reports by friends and family, in the public realm and during interviews with Mr. Gonzalez. He has been bedeviled by insecurity, guilt, and self-destructive elements out of his awareness, reach or control – blindly driving behaviors he now regrets with the perspective allowed by 18 months in prison.

*Id.*

> [Gonzalez'] 18 months in prison have cleared his mind, detoxified his ill computer-Internet-information addiction, and fostered his ability to look at what he has done with guilt and remorse.

*Id.* at 5. Gonzalez' former girlfriend, who has continued to speak with Gonzalez frequently, notes in her letter to the Court that she "can already see a change in him" and that she "know[s] he regrets everything he has done and if he could, he would take it all back." Letter of Jenny Bulas. Jenny's mother, a retired Treasury Department Criminal Investigation Division agent who conducted money

laundering investigations for 27 years and in that capacity dealt with drug traffickers and money launderers, as well as with other varieties of criminals, knows Gonzalez well and sees in him strong prospects for redemption and rehabilitation: "I believe that Albert has learned his lesson. He has taken responsibility for his deeds, is very remorseful and will definitely never commit any crime again. Being locked up for almost two years has made him reflect upon his deeds and the harm he has caused many people and above all, his family." Letter of Lydia Bulas. This was written by a woman who reports in her letter that she has not spoken to her own brother for eight years because of his past criminal involvement.

For the reasons discussed previously in this section and set forth in Dr. Roth's report, Gonzalez had, while he was committing the crimes for which he now stands before the Court for sentencing, "a significantly impaired ability to . . . control behavior that [he knew] was wrongful." USSG §5K2.13, Application Note 1. His diminished capacity provides both an ample basis for a downward departure from the guidelines and/or, regardless of whether a departure is imposed, for a sentence pursuant to the §3553(a) criteria at the lowest end of the agreed-upon sentencing range.[7]

A sentence of fifteen years is a substantial one. It will result in Gonzalez' never knowing freedom from the age of 27 through the age of 40 because of crimes he committed in his twenties. His crimes were ones that resulted, in part, from impaired judgment and compulsivity and not from the cold calculations of pure greed or from a willingness to cause grave injury to the security and finances of people who trusted perpetrators of other white collar crimes – such as CEOs and hedge fund managers – who stole their money and bankrupted their retirement accounts, all so they could

---

[7] §5K2.13 precludes departure if the defendant's significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants, but in Gonzalez' case, his inability to control his behavior was not caused by drugs or alcohol, although they may have had a synergistic effect on his underlying mental and emotional deficiencies.

9

put huge sums of money in their own pockets and yet have often received sentences below the sentence recommended by the government in this case. *See* Section II(D), *infra*. A fifteen year sentence more than fulfills society's need to punish Gonzalez and to deter him and others. Gonzalez is committed to rehabilitating himself and to gaining an understanding of what caused him to commit the crimes which he did and thereby learn from his mistakes and prevent their recurrence. In fifteen years, society will not be at risk from Albert Gonzalez.[8] A sentence of more than fifteen years would be punishment without purpose.

### C. The §2B1.1 Loss Table As Applied by Probation to the Unparticularized Data Supplied by the Government Results in An Irrationally High Offense Level.[9]

The guidelines offense level calculated by probation – level 52, which corresponds to a life guideline – is driven predominantly by the addition of 30 levels pursuant to the USSG §2B1.1 loss table, which Probation derived though application of §2B1.1, Application Note 3(F)(i), which specifies a loss figure of not less than $500 for each access device in involved. Multiplying this $500 figure by the number of access devices involved, as alleged by the government, Probation derived a loss figure of $20 billion. That figure – and even the "more than $400 million" which resulted in the addition of 30 levels to Gonzalez' offense level, PSR at 24 – and the $500 per access device equation from which it derives is completely arbitrary and lacking in any empirical validation. The $500 per card loss figure set forth in Note 3(F)(i) is arbitrary and irrational in violation of the Due Process Clause of the Fifth Amendment and produces a grossly disproportionate total offense level

---

[8] Following his release, Gonzalez will be subject to a three-year term of supervised release. During that time, limitations will predictably placed on Gonzalez' use of the internet as an additional safeguard against further criminal activity by Gonzalez.

[9] Gonzalez raised objections to the loss calculation in his initial objections to the PSR, filed with Probation on November 16, 2009, which are addressed in the revised PSR, and in supplemental objections filed on November 23, 2009, which were appended by Probation to the revised PSR.

in violation of the Eighth Amendment. Certainly the figure is completely arbitrary and irrational for expired cards or cards that could not be used for any reason, as no loss was possible in such cases.[10] For example, the PSR states that of the 36 million card numbers obtained from TJX, at least 25 million – approximately 70% – were expired, PSR ¶35, and therefore unusable. It is also arbitrary and irrational as to the cards which were still usable, particularly when the multiplier is millions of cards. For example, the PSR states that defendants obtained account information for 5,132 credit cards through the Dave and Buster's intrusion, but only 675 of the cards – about 13% – were ever used. PSR ¶26. The government also, with one exception, has not attempted to quantify the number of cards as to which the information was actually sold. The one exception is the statement in the PSR that codefendant Scott estimated that 300,000 to 400,000 credit card numbers obtained from BJ's Wholesale Club were sold. PSR ¶31. As referenced in a supplemental objection to this averment, Scott himself told the government that whatever was stolen was sold by Gonzalez for $60,000, half of which went to Scott. *See* Exhibit D, submitted herewith. Gonzalez has contested the reliability of Scott's estimate of the amount of stolen data. On information and belief, the vast majority of the data stolen from TJX was neither sold to or used by third parties to the detriment of card holders, further distinguishing this case from a classic identity fraud case and further illustrating the lack of principled basis for equating the loss attributable to Gonzalez for sentencing purposes with the numbers in TJX's SEC filings. Equally importantly, the conclusory (and changing) overestimates of prejudice to the corporation cannot without a far more particularized basis provide a trustworthy barometer for a finding as to either loss or restitution.

---

[10] This case is not at all like the examples given in §2B1.1, App. Note 3(A)(ii) for impossible or unlikely losses – a government sting operation or a fraudulent insurance claim in excess of the insured value. Here, there is no evidence that defendant had any intent to attempt to use the unusable cards, and certainly no evidence that $500 could rationally reflect the intended loss.

Most importantly, despite having had access or potential access for several years to the foreign servers, to TJX's own internal investigation, and to records from VISA, MasterCard, and American Express, as well as possession of Maksym Yastremskiy's[11] computers and of records which would distinguish between losses attributable to the corporate response to the intrusion and losses attributable to use of the stolen data, the government has never quantified the amount of stolen data which was actually used to unlawfully obtain money from ATM machines, retailers, banks, or other sources to which the data was linked. Critically, despite the government's possession of Yastremskiy's computers, the government has adduced no evidence regarding the extent to which the stolen TJX data was ever used to an individual cardholder's detriment, as opposed to simply remaining on the server. And, as to TJX, a telling indicium of the degree of damage it suffered is found in the fact that during one of the most devastating economic periods in the country's history, TJX's stock value *rose* 30% – from $29.50 per share on January 18, 2007, to $38.40 on November 30, 2009. Nor has the government particularized the generalized loss figures from the remaining retailers but has instead simply relied on statements contained in annual reports and SEC filings. Such generalized and undifferentiated figures do not provide a reliable basis for calculation of the loss for purposes of the §2B1.1 loss table.

Use of the $500 figure as a multiplier produces a figure which bears no relationship to actual or intended loss or to Gonzalez' gain. Gonzalez' gain was minimal even when compared to the $400 million threshold amount. The PSR simply states that "Gonzalez made well over a million dollars from his computer intrusions, data thefts, and frauds." PSR ¶57. The indictment sought forfeiture of $1.6 million in proceeds, which presumably reflects the government's best estimate of the

---

[11] The government believes that Yastremskiy was the principal purchaser of data stolen by Gonzalez.

proceeds derived from the offense and which Gonzalez agreed to forfeit under the plea agreement – $1.1 million of which Gonzalez voluntarily gave back to the government because of his desire for finality.

As for actual loss, the PSR lists the following: TJX, "more than $180.5 million in losses and associated expenses" (later changed to $171.5 million, itself a reflection of guesswork); DSW, $6.5 to $9.5 million; BJ's, $11 to $13 million; Dave and Buster's, $720,288. PSR ¶26. Most of that approximately $200 million comes from the figures which TJX reported in its 10K and 10Q reports filed with the SEC. The TJX figure includes "settlements paid to date, legal fees, computer consultant fees, public relation consultant fees, investigation costs, and miscellaneous expenditures," PSR ¶26, and the government has made no effort to separate those sums which are properly included in the loss calculation from those which are not. Gonzalez' offense level, and concomitantly, his punishment, should not be inflated because TJX decided to spend millions of dollars on public relations or because it spent large sums of money replacing its computer system with a new and improved system rather than replacement costs to restore the old system.[12] Insofar as the settlements which TJX has paid to date or will pay in the future, it is important to note that the causes of action in the litigation against TJX include negligence and even negligence per se. *See* Exhibit E (excerpt of TJX SEC filing), submitted herewith. In addition, on September 25, 2007, the Office of the Privacy Commissioner of Canada and the Office of the Information and Privacy Commissioner of Alberta issued a report of their joint investigation of the TJX security breaches. Among the report's conclusions were that TJX's long-term storage of large quantities of personal data violated the

---

[12] Section 2B1.1, Application Note 3(A)(v)(III) specifies that actual losses for offenses under 18 U.S.C. §1030 include, *inter alia*, the cost of "restoring the data, program, system, or information *to its condition prior to the offense*" (emphasis added). This would not include the costs which TJX incurred in making its systems what they should have been, but were not, prior to the offense.

13

privacy laws of Canada and Alberta, that TJX did not take proper steps to manage the risk of intrusion, that TJX did not move quickly enough in changing from a weak encryption standard to a stronger one, that it did not monitor its computer systems properly, and that its data storage system did not meet the requirements set by the Payment Card Industry Data Security Standard. *See* Exhibit F, submitted herewith.

Because TJX's pre-intrusion data security systems were seriously deficient in safeguarding the personal data of its customers, a form of multiple causation is at work here. While Gonzalez' offenses were serious, and the negligence of the principal victim, TJX, in no way excuses Gonzalez' offense, that TJX was itself negligent in maintaining confidential customer data on a system which could so easily be penetrated is relevant to whether the "losses" it declares should be translated, dollar for dollar, into either a barometer to enhance Gonzalez' guidelines or as a guide to a valid reliable restitution amount. *See In re TJX Companies Retail Sec. Breach Litigation*, 564 F.3d 489 (1st Cir. 2009)("If the charges in the complaint are true . . ., a court using these general FTC criteria might well find in the present case *inexcusable and protracted reckless conduct*, aggravated by failure to give prompt notice when lapses were discovered internally, and causing very widespread and serious harm to other companies and to innumerable consumers"(emphasis added)).

Again, this is not an attempt to "blame the victim" – Gonzalez accepts full responsibility for the offenses to which he pled guilty – but is instead an accurate appraisal of what occurred here. TJX's losses were in part the consequence of its own negligence, which has been recognized as an appropriate multiple causation consideration. *See, e.g., United States v. Keller*, 2005 WL 6192897 at *5 (N.D.Tex. October 17, 2005); *United States v. Roen*, 279 F.Supp.2d 986, 990 (E.D. Wis. 2003); *see generally United States v. Rostoff*, 53 F.3d 398, 406-08 (1st Cir. 1995). For similar reasons, Gonzalez should not be held responsible for costs incurred by TJX in defending itself against

14

governmental investigations into whether its carelessness in safeguarding customer data violated the consumer protection laws or other related laws of various states. Once again, it was Gonzalez' offenses which brought the problem to light, but if TJX's data retention systems provided less than the required degree of protection, that is not the fault of Gonzalez. The actual loss for which Gonzalez could reasonably be held responsible is considerably less than the approximately $200 million referenced in the PSR and certainly bears no relation to the more than $400 million figure which drove his offense level to such extreme heights.

As for intended loss, "intended loss" "is a term of art meaning the loss which the defendant reasonably expected to occur at the time he perpetrated the [offense]." *United States v. Inarelli*, 524 F.3d 286, 290 (1st Cir.), *cert. denied*, 129 S.Ct. 350 (2008), *citing United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007). By no stretch of the imagination did Gonzalez expect that losses remotely approaching $400 million would result from his offenses.

The arbitrary $500 figure provides a basis for sentencing Gonzalez to the bottom of the agreed-upon range, as the guidelines call for a sentence which vastly overstates the loss, either actual or intended. Unlike most guidelines, which have a carefully calibrated empirical basis, the $500 figure is an arbitrary figure without empirical foundation. *See Kimbrough v. United States*, 552 U.S. 85, 96-97 (2007)(noting Commission's abandonment of empirical approach when it came to formulating guidelines for sentencing in drug cases); *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007)(same). Thus, that guideline provision "do[es] not exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough*, 522 U.S. at 563; *see Gall*, 522 U.S. at 46 n.2. Section 2B1.1, App Note 3(F)(i) effectively substitutes the arbitrary $500 figure for the individualized consideration demanded by §3553(a) and recent Supreme Court precedent. There is, therefore, less reason to believe that, as a general matter, §2B1.1, App Note 3(F)(i) strikes the

appropriate §3553(a) balance. *See United States v. Stone*, 575 F.3d 83, 93 (1st Cir. 2009)(recognizing that, after *Kimbrough*, district court has discretion to sentence below the guidelines where guideline is not based on empirical data), *petition for cert. filed* December 4, 2009 (No. 09-7972). For example, a number of courts have cited the lack of empirical support for the child pornography guidelines as a basis for sentencing below the guidelines. *See, e.g., United States v. Johnson*, 588 F.Supp.2d 997 (S.D.Iowa 2008); *United States v. Grober*, 595 F.Supp.2d 382 (D.N.J. 2008); *United States v. Noxon*, 2008 WL 4758583 (D.Kan. Oct.28, 2008); *United States v. Grinbergs*, 2008 WL 4191145 (D.Neb. Sept.8, 2008); *United States v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wis.2008). Courts have also adopted this approach in varying from the guidelines in crack cases. *See, e.g., Henderson v. United States*, 2009 WL 2969507 (E.D.La. September 11, 2009); *United States v. Lewis*, 623 F.Supp.2d 42 (D.D.C. 2009); *United States v. Gully*, 619 F.Supp.2d 633 (D.D.C. 2009); *United States v. Horn*, 590 F.Supp.2d 976 (M.D.Tenn. 2008).

For all these reasons, the loss figures on which the government and Probation rely are arbitrary and grossly overstated, providing a reason, in conjunction with other reasons addressed in this memorandum, for sentencing Gonzalez at the low end of the agreed-upon range.[13]

**D.     Sentencing Disparity.**

Finally, a sentence at the bottom of the agreed upon range is necessary to avoid unwarranted sentencing disparities with others convicted of financial crimes. Section 3553(a)(6) instructs sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In the range of sentences meted out under the guidelines for white-collar fraud defendants, even a 25-year sentence would rank as

---

[13] For these same reasons, the restitution figure contained in the PSR (¶180) grossly overstates the amount of losses which are subject to a restitution order.

among the most severe nationwide. Defendants who violated their fiduciary duties, who stripped people's investments of all or most of their value, whose offenses left retired employees without the support of the pensions they had earned and current employees unemployed and destitute, who caused the collapse of major business and financial institutions, with significant impacts on the rest of the economy, have received sentences comparable or even less than the agreed upon 15-25 year range.

For example, Jeffrey Skilling, who was instrumental in the massive Enron fraud, one of the biggest frauds in this country's history, which resulted in the collapse of the company and losses in the billions to other companies and institutions, investors, and employees, was sentenced to 24 years in prison.[3] Bernard Ebbers, the former WorldCom CEO who masterminded an $11 billion fraud which left WorldCom in bankruptcy and its 17,000 employees unemployed and wiped out the savings of thousands of investors was sentenced to 25 years. *See United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). For the huge fraud which drove Adelphia, one of the largest cable television providers in the country, into bankruptcy and completely wiped out all shareholder value, *see United States v. Rigas*, 490 F.3d 208, 212 (2d Cir. 2007), the two chief perpetrators of the fraud were ultimately sentenced to terms of 12 and 17 years. Philip Bennett, the Refco CEO who was responsible for a $1.5 billion fraud which destroyed one of the world's largest commodities brokerages, was sentenced to 16 years. Closer to home, Bradford Bleidt, who for twenty years operated an investment Ponzi scheme which bilked investors of tens of millions of dollars,[4] was

---

[3] On appeal, the Fifth Circuit remanded for resentencing. *United States v. Skilling*, 554 F.3d 529, 595 (5th Cir. 2009). Skilling has not yet been resentenced.

[4] *See Fine v. Sovereign Bank*, 2009 WL 4250076 at *1 (D. Mass. November 27, 2009).

sentenced on a plea of guilty to 135 months. *United States v. Bleidt*, No.1:05-cr-10144-WGY (D.Mass), Doc. 32.

The harm done by Gonzalez' crimes, while substantial, did not have the profoundly devastating effect of crimes such as these. No pension plans were wiped out. No investors lost their life's savings. No one's lives and financial security were destroyed. No publicly-traded companies were destroyed. Yet defendants who violated their fiduciary duties, who stripped people's investments of all or most of their value, whose offenses left retired employees without the support of the pensions they had earned and current employees unemployed and destitute, who caused the collapse of major business and financial institutions, with significant impacts on the rest of the economy, have received sentences equal to or less than 25 years.[5] While there were, to be sure, different types of fraud involved in the cases cited, this case is not a typical identity fraud case. The stolen data was not used to create false identification documents, nor was it used in a manner which compromised the identities of the individuals whose data was stolen.

Not only did Gonzalez' crimes not inflict the wholesale devastation which these defendants' crimes did, he is, as discussed in Section II(B), *supra*, less morally culpable than such defendants for several reasons. Unlike most white collar criminals, Gonzalez was not motivated by personal

---

[5] Gonzalez anticipates that the government will rely on *United States v. Bunchan*, 580 F.3d 66 (1st Cir.), *cert. denied*, 130 S.Ct. 439 (2009), in support of its argument for a 25-year sentence. The 35-year sentence imposed in *Bunchan* was, however, based on a number of exacerbating factors which are not present here. First, the district court was presented with evidence that Bunchan's "devastating" Ponzi scheme, *id.* at 66, had ruined the lives of a number of investors, wiping out savings and leaving them homeless. *Id.* at 72-73. Second, the district court was influenced by Bunchan's "large lack of remorse." *Id.* Third, Bunchan preyed upon the "vulnerability and susceptibility" of the victims, who were predominantly Cambodian immigrants, to induce their investment in his scheme. *Id.* at 73. Fourth, Bunchan "flagrant[ly]" diverted about $4 million of the investors' money to finance a lavish lifestyle. Fifth, Bunchan actively embarked upon a plot to murder the prosecutor and witnesses, with which he was subsequently charged and convicted, in pursuit of which he engaged the services of hit man (in actuality an undercover agent) and provided him with a prioritized hit list. *Id.* at 69, 73.

greed, nor was he cognizant as he conducted his computer intrusions of the damage he would inflict on the individuals who had their data stolen. His focus on his computer activities was so intense and so single-minded that he simply did not think beyond what he was doing to the real-world consequences of his conduct. And this was not because he has no conscience or lacks a sense of right and wrong but instead because of the grip of his obsession and the personal gratification he received from his computer prowess, something that was otherwise lacking in his life. He has already begun the process of examining what he did and why and of gaining the necessary understanding to keep him from falling into the same errors again. He knows that it will not be an easy process, but it is one to which he is committed.

## CONCLUSION

For all the foregoing reasons, Gonzalez asks the Court to impose a sentence of no more than fifteen years.

> Respectfully Submitted,
> By His Attorney,
>
> **/s/ Martin G. Weinberg**
> Martin G. Weinberg
> Martin G. Weinberg, PC
> Mass. Bar No. 51948
> 20 Park Plaza, Suite 1000
> Boston, MA 02116
> (617) 227-3700
> owlmgw@att.net

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 18th day of December, 2009, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants, including Stephen P. Heymann, AUSA.

> **/s/ Martin G. Weinberg**
> Martin G. Weinberg