EXHIBIT "C"

# BARRY H. ROTH, MD

*Diplomate in* **Psychiatry**
*American Board of Psychiatry & Neurology*
*with Certification of Added Qualifications*
*in the Subspecialties of*
**Addiction Psychiatry**
**Geriatric Psychiatry**
**Forensic Psychiatry**

320 Washington St., 4th Floor
Brookline, MA 02445-6873

Telephone: (617) 734-3572
Fax: (617) 734-2757

Attorney Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, MA 02116

December 14, 2009

**Re: Mr. Albert Gonzalez Forensic Psychiatric Evaluation**

Dear Attorney Weinberg,

I make these statements with medical certainty, to the best of my knowledge and belief with the information currently available to me.

The foundation of this report following includes, but is not limited to:

    Interviews of your client at the Wyatt Detention Center;
        November 16, 2009, approximately 2 ½ hours with Attorney Paul   Trusiani and 2 ½ hours alone with Mr. Albert Gonzalez,
        December 2, 2009 approximately 5 hours with Mr. Albert Gonzalez;
    Documents and information provided to me by yourself and Attorney Trusiani, including letters of support from friends and family;
    Literature search and research, including but not limited to the American Psychiatric Association Diagnostic and Statistical Manual-IV Text Revised (DSM-IV-TR), Textbook of Substance Abuse Treatment, Second Edition, Practice Guidelines of the American Psychiatric Association;
        Refereed journals and Internet; Publications in the public realm;
    Clinical experience spanning four decades.

I have a strong bias in favor of a high level of integrity, honesty, and ethics, in the professional practice of myself and my colleagues. My Curriculum Vitae indicates my professional experiences of a broad and deep nature spanning four decades which are specifically and

generally pertinent to this report. I have also had significant personal experience with Identity Theft in the recent past.

I have made my best effort to put aside personal prejudices to perform my professional duties. It is in the face of these predictably strong negative biases that my following findings and conclusions were so stunning and unexpected.

Mr. Albert Gonzalez is a decent human being who has done the best he could with the tools he has had. He has struggled to do so in the past, and continues to do so in the present.

He is very bright quick in some ways, but, very slow and ill-equipped in other ways--- hard-working, unassuming, humble and introspective to apply his mind to himself and the world as best he can.

Even now, Mr. Gonzalez continues a childlike way of seeking fairness, admitting his faults, accepting responsibility, showing remorse, and trying to learn and grow. He has remorse and regret. He has admitted wrongdoing and accepted responsibility. He is willing and able to rehabilitate.

He criticizes his past notorious illegal activities. He does not make excuses. He does not blame others. He is not defensive, evasive or unwilling to look at hard questions about himself and what he has done. He labels what he has done as morally wrong.

Mr. Gonzalez was quite clear that he now understands himself as having a high level of aptitude with computer technology. He was also very clear to differentiate that high level of aptitude from what he would consider to be real intelligence. Specifically, he now labels mistakes he made with those very aptitudes essentially dumb and unintelligent.

Beyond that, he asserted that the perspective allowed him by the detoxification from his previously uncontrollable compulsions enforced by 18 months of incarceration have made it clear to him that his biggest mistake was using his abilities, such as they were, to do bad things.

The structure and nature of his mental processes included extreme aptitudes that were the means of his undoing when he used them ill gain and wrong achievement. At the same time, catastrophic social lacks, failures, and weaknesses pushed him into gratification and snares (his misdeeds) which he could neither resist, nor pull himself out of once caught in their grips.

His personal life has been characterized most of all by awkwardness, impairment, troubles connecting to people, with an overarching preference and predilection to machines and technology.

The computer was his friend. Peers were people similarly equipped and impaired, often met and engaged with in cyberspace.

3

There is a remarkable consistency in the reports by friends and family, in the public realm and during interviews with Mr. Gonzalez. He has been bedeviled by insecurity, guilt, and self-destructive elements out of his awareness, reach or control --- blindly driving behaviors he now regrets with the perspective allowed by 18 months in prison.

Sensitivity, insecurity, social awkwardness, isolation, feeling and being misunderstood all contributed to make it easier to relate to machines and technologies than to people. They continue in the present and limit his ability in the spheres of emotion, empathy, social rules, and mutual give-and-take that we expect to be easily recognized, understood, accepted, and performed.

Past and present lack of social perspective and his sensitivity reinforces the validity of the many reports of his being in an awkward loner with few friends or satisfactions in life outside of the computer world. They peer highly probable, not merely plausible.

He was labeled and regarded as a person who was virtually possessed by a twisted genius --- a kind of malignant genii. His manifestation of appearance and behavior was lonely, sensitive, obsessed and compulsive, guilty and self-defeating, process-oriented, often heedless of unforeseen negative consequences, insecure, embarrassed and ashamed, outcast, with self-esteem and confidence tragically flawed.

Family, friends, religious teachers, schools and authorities all did the best they could, as did Mr. Gonzalez. From the outset, however, he experienced his extraordinary computer machine and information technology aptitude as something that others regarded as a curse. The one thing he deeply felt precious and himself brought him harsh words and criticism.

People in his childhood home and school environment did not understand his capacities, nearly as much as they labeled the abilities as a troublesome problem. Deep down, abiding truth of his value as a person was that he possessed great aptitude; and that his fervent goal and intention to learn as much as he could about computers--- fill himself up with information—was a good one.

But, he had no constructive or useful way to communicate his heart's concerns---as a young child, to gain parental and social recognition, to be nurtured and grow to someday enjoy making his worthy contributions that would benefit his family and society.

Criticism and opprobrium grew. Mr. Gonzalez spiraled down the slippery slope, descending into greater and greater misdeeds. As it were, his journey through the circles of hell was paved with good intentions.

His specific cognitive and intellectual style included a lack of reflection, coupled with impulsivity and a concomitant failure to think of potential negative consequences. He had a reverential single-minded focus to learn and gain knowledge about computers.

4

He has related most and best with people in the context of computers. He has tended, and continues to, think in of computer commands and computer language.

He identified with his computer. It is hard, if not impossible, even at the present for Mr. Gonzalez to conceptualize human growth, development and evolution, other than in the language of building a machine. Coupled with that, he learns directly from making mistakes.

Mr. Gonzalez now recognizes that his guidance and supervision he needed tragically failed to steer him along the straight and narrow path of dignity and honor, achieved through constructive and helpful behavior.

Very much to his credit, at the same time that he recognizes he failed to receive good-enough guidance, Mr. Gonzalez does not place the blame on his loved ones who tried their best, nor on school and local police authorities, NASA, the FBI, the Secret Service, or the world of commerce, where he tried to fit and work.

It is my professional opinion that two powerful factors exerted devastating influences on Mr. Gonzalez to weaken, impair, undermine, obscure, obstruct and diminish his powers, capacities, and abilities of decision-making, planning, moral judgment, and impulse control necessary for him to comport his behavior to the norms and dictates of lawful society--- *i.e., his capacity to knowingly evaluate the wrongfulness of his actions and consciously behave lawfully and avoid crime.*

From roughly the age of nine, authorities demonstrated various and inconsistent confusing and ambivalent, or merely ineffectual attitudes and approaches. In their love, his parents tried their best. When his mother tried to get him to seek psychological help, Mr. Gonzalez experienced her concerns as criticism of his cherished all-consuming, and all-encompassing, rapture with his computer--- his reason for being— roughly, telling him that he was sick and bad.

His father arranged a fake arrest with friends in the police force, akin to an "intervention" in addictions. Following this, as a mere teen, Mr. Gonzalez presented himself to a website design job interview. He was surrounded by MBA's, with their portfolios and attaché cases. On his resume, he listed his work experience as helping his father cut trees and stated that he knew about computers. Disappointed and disgruntled and knowing that he did not get the job, he left and went back to his usual scenes and scopes of action.

Detectives from the Miami-Dade High Tech Crime Squad came to his high school and called in his father; but then merely confiscated the hard drive from his computer.

Later, after Mr. Gonzalez had hacked into the computers of the government of India and NASA, the FBI and NASA came to his high school. Basically, they said, "Don't do it anymore"

5

Mr. Gonzalez moved to Metropolitan New York, took a job with a "Dot.com" that folded then worked for Siemens, until he was laid off. Short of funds, he used a bogus card at an ATM--- widely known to photograph transactions --- and was arrested.

Secret Service recruited him to work with them tracking down Internet criminals. They even arranged for Mr. Gonzalez give lectures to their Agents, as well as to the American Banking Association. Apparently, his talks included international operational methods and technology they taught him.

In summary, though we are dealing with the complexity of a human being, we can use diagnostic labels discuss aspects of Mr. Gonzalez.

Many elements of Mr. Gonzalez' experience and behavior are consistent with description of the Asperger's Disorder. He was most likely born with a nervous system vulnerable to the pervasive developmental disabilities characterized by unconventional, and by norms of society, flawed and impaired social and cognitive skills; side-by-side with an idiot-Savant-like genius for computers and information technology.

Mr. Gonzalez meets criteria for Internet Addiction, synergized by (---neither explained nor excused by) substance abuse. Mr. Gonzalez could not control his compulsion and obsession with computers and the Internet. Cyber-reality could be so interesting, captivating, and all-consuming that it would fuel two or three days of action without his feeling the need for sleep.

Nor was he able to master the tasks of childhood and young adult development to achieve and maintain healthy self regards through his welcome contributions to society. He tried to stop and redirect himself, and could not.

His social awkwardness, lack of friends, pervasive criticism from early childhood onwards and the way that he developed and applied his enormous machinelike aptitude for machines, in his search for recognition all operated together to condition and determine his self-defeating and uncontrollable behaviors destined to produce only one possible outcome: the compulsive criminal behavior that inevitably lead to his to capture and punishment.

Up to 15% of the adult American population has substance abuse. Mr. Gonzalez is one person who contributes to that statistic. He has suffered, and is now suffering, the negative consequences of the further impairment of his judgment and behavior due to drugs and alcohol.

His 18 months in prison have cleared his mind, detoxified his ill computer-Internet-information technology addiction, and fostered his ability to look at what he has done with guilt and remorse.

Sincerely, *Barry H. Roth, MD*
Barry H. Roth M.D.

10/07/2009  14:44  6177342757                                              Barry Roth,MD                                          #0135 P.005/019
Case 1:08-cr-10223-PBS   Document 76-4   Filed 12/18/2009   Page 6 of 18

# CURRICULUM VITAE AND BIBLIOGRAPHY

## PART I: General Information

**Date Prepared:**       May 6, 2009

**Name:**                Barry H. Roth, M.D.

**Office Address:**      320 Washington St., 4th Floor
                         Brookline, MA 02445

**Home Address:**        PO Box 470718
                         Brookline Village, MA 02447

**Email:**               broth@bidmc.harvard.edu
**FAX:**                 617-734-2757

**Place of Birth:**      Rochester, New York

**Education:**

| | | |
|---|---|---|
| 1969 | A.B. | Cornell University, Chemistry Major |
| 1973 | M.D. | University of Rochester School of Medicine and Dentistry |

**Postdoctoral Training:**

| | |
|---|---|
| 1973-1974 | Rotating Intern in Medicine, Highland General Hospital, Oakland, CA |
| 1975-1977 | Resident in Psychiatry, Massachusetts Mental Health Center, Boston, MA |
| 1977-1878 | Chief Resident, Southard Outpatient Clinic, Massachusetts Mental Health Center, Boston, MA |
| 1978-1979 | Fellow in Community Psychiatry, Tufts- New England Medical Center, Boston, MA |

Barry H. Roth, M.D. -- Page 2

**Licensure and Certification:**

| | |
|---|---|
| 1975-Present | Massachusetts License Registration #38670 |
| 1983-Present | American Board of Psychiatry, Psychiatry and Neurology (ABPN) |
| 1988-1998 | American Society of Addiction Medicine -- Addiction Medicine |
| 1993, 2003-2013 | Addiction Psychiatry (ABPN) |
| 1994, 2004-2014 | Geriatric Psychiatry (ABPN) |
| 1999-2009 | Forensic Psychiatry (ABPN) |

**Academic Appointments:**

| | |
|---|---|
| 1974-1975 | Clinical Instructor, Ambulatory and Community Medicine, University of California at San Francisco |
| 1975 | Assistant Research Physician, Langley Porter Organized Activities, University of California at San Francisco |
| 1975-1978 | Clinical Fellow in Psychiatry, Harvard Medical School, |
| 1976-1977 | Clinical and Research Fellow, Alcohol and Drug Abuse Research Center, McLean Hospital, Belmont, MA |
| 1978-1979 | Fellow in Community Psychiatry, Tufts New England Medical Center, Boston |

Clinical Instructor in Psychiatry:
　　Harvard Medical School:

| | |
|---|---|
| 1978-1984 | Massachusetts Mental Health Center; |
| 1985-1987 | Cambridge Hospital; |
| 1992-2000 | New England Deaconess Hospital/Beth Israel Deaconess Mental Health Center |
| 1979-1983 | Instructor in Psychiatry, Harvard Medical School: Brockton VA Medical Center and Massachusetts Mental Health Center |
| 1984-1985 | Assistant Clinical Professor of Psychiatry, University of California at San Francisco, San Francisco VA Medical Center |

10/07/2009 14:44 6177342757　　　　　Barry Roth,MD　　　#0135 P.007/019
Case 1:08-cr-10223-PBS   Document 76-4   Filed 12/18/2009   Page 8 of 18

Barry H. Roth, M.D. -- Page 3

**Hospital Appointments:**

**Current:**

| | |
|---|---|
| 2003- 2007 | Research Associate, Program in Psychiatry and the Law, Massachusetts Mental Health Center and Department of Psychiatry, Beth Israel Deaconess Medical Center, Harvard Medical School |
| 2002-Present | Courtesy Staff, Brigham & Women's and Faulkner Hospital |

**Other Appointments:**

| | |
|---|---|
| 1975 | Assistant Research Physician, Langley Porter Organized Activities University of California, San Francisco (Collaboration in Marijuana Research Projects with Reese Jones, M.D., and Neil Benowitz, M.D. |
| 1975 | San Francisco General Hospital, Department of Medicine, |
| 1978-1984 | Supervising Psychiatrist, Massachusetts Mental Health Center, Boston, MA |
| 1979-1983 | Staff Physician in Psychiatry, Veterans Administration Medical Center, Brockton, MA |
| 1978-1984 | Assistant in Psychiatry, Alcohol and Drug Abuse Research Center, McLean Hospital, Belmont, MA (Participation in Heroin Research under the direction of Steven Mirin, M.D.) |
| 1982-1984, 1986-1988 | Consultant in Psychiatry, Brookline Hospital Brookline, MA |
| 1982-1984, 1989-2004 | Variously, Consulting, Courtesy, Active, and Professional staff positions according to activity in Psychiatry (Department of Medicine), New England Baptist Hospital, Boston, MA |
| 1982-2000 | Courtesy Staff, Bournewood Hospital, Brookline, MA |
| 1984, 1986-1988 | Affiliate in Psychiatry (Medicine), New England Deaconess Hospital, Boston, MA |
| 1984-1985 | Chief, Alcoholism Inpatient Unit, Veterans Administration Medical Center, San Francisco, CA |

10/07/2009 14:44 6177342757 Barry Roth.MD #0135 P.008/019
Case 1:08-cr-10223-PBS Document 76-4 Filed 12/18/2009 Page 9 of 18

Barry H. Roth, M.D. -- Page 4

| | |
|---|---|
| 1985 | Assistant Director, Inpatient Psychiatry, Mount Auburn Hospital, Cambridge, MA |
| 1988--- | Courtesy Staff, Psychiatry (in the Department of Medicine, then in the Department of Psychiatry), New England Deaconess Hospital/Beth Israel Deaconess Medical Center, Boston, MA |
| 1992-2002 | Teaching Psychiatry, Faulkner Hospital/B&WH, Boston, MA |
| 1993-1994 | Courtesy Staff, Arbour Hospital, Human Resource Institute, of the Arbour System, Boston and Brookline, MA |
| 1999-2000 | Consulting Staff, Jewish Memorial Hospital, Boston, MA |
| 1992-2002 | Teaching Psychiatry, Faulkner Hospital/Brigham & Women's & Faulkner Hospital, Boston, MA |
| 1993-1994 | Attending Psychiatrist, Arbour Hospital and Human Resource Institute of The Arbour System, Boston and Brookline, MA |

**Other Professional Positions and Major Visiting Appointments:**

| | |
|---|---|
| 1974-1975 | Physician, City and County Jail of San Francisco at San Bruno, California. I worked with the Prisoners' Health Project, part of remediation efforts monitored by a Federal Court Master following a class action suit by San Francisco County prisoners. Substandard medical care had violated the Constitutional prohibition of cruel and unusual punishment. My report, "Evaluation of Health Care Conditions in San Francisco County Jail", informed the oversight process, "Prisoners' Health Project: A Commitment to Change," Medical Care for Institutionalized Persons, Final Report, 1974 through 1978, supported by Grant Number 09-H-001335, awarded by the Public Health Service of the Department of Health, Education and Welfare, Region 9 IX, San Francisco, CA.) |
| | I participated in the Press Conference, "Decent health care in county jails requires that supervisors and Mayor approve major budget increase., on November 1, 1974, |

10/07/2009 14:45 6177342757         Barry Roth,MD              #0135 P.009/019
Case 1:08-cr-10223-PBS   Document 76-4   Filed 12/18/2009   Page 10 of 18

Barry H. Roth, M.D. -- Page 5

|  |  |
|---|---|
|  | called by the Medical Committee for Human Rights at the Federal Building, 450 Golden Gate Avenue, San Francisco, CA, |
| 1975 | Medical Consultant, San Francisco Neighborhood Legal Assistant Foundation, particularly in matters of service erosion in "Prepaid Health Plans" for California Medicaid recipients. |
| 2005 | Informal "Adjunct" to Boston Center for Refugee Health and Human Rights, Department of Psychiatry, Boston Medical Center, Michael Grodin, M.D. Director |

**Major Committee Assignments:**

| 1993 | Curriculum Committee, Harvard Longwood Psychiatry Residents Training Program, Harvard Medical School, Boston |
|---|---|

**Professional Societies:**

| 1981-1993, 1997-Present | American Psychiatric Association |
|---|---|
| 1981-1990 | Physicians for Social Responsibility, American Affiliate of International Physicians for the Prevention of Nuclear War (Recipient, Nobel Prize for Peace, 1985) |
| 1988-1990 | American Society of Addiction Medicine |
| 1994-Present | Physicians for Human Rights |
| 2002-Present | American Academy of Psychiatry and the Law |

**Community Service Related to Professional Work:**

| 1994-Present | *Pro Bono* Examiner and witness for affidavit and courtroom testimony, Asylum Network, Physicians for Human Rights |
|---|---|
| 1990-2004 | Human Rights Delegations, with particular focus on |

10/07/2009 14:45 6177342757 Barry Roth,MD #0135 P.010/019
Case 1:08-cr-10223-PBS Document 76-4 Filed 12/18/2009 Page 11 of 18

Barry H. Roth, M.D. -- Page 6

psychological trauma, mental health parameters, indices and treatment approaches: Nicaragua and El Salvador, 1990; Guatemala, 1995; El Salvador, 1996; Israel/Palestine, 1997,1998, 2004; Guatemala and Mexico, 2000.

**Awards and Honors:**

2007    Distinguished Fellow
Massachusetts Psychiatric Society
American Psychiatric Association

## PART II: Research, Teaching and Clinical Contributions

### A. Narrative report of Research, Teaching and Clinical Contributions

I have provided Forensic Psychiatric Expert opinions, reports, deposition, and trial testimony in a variety of civil and criminal realms:

- competency to consent for clinical services (Rogers determinations);
- financial and testamentary capacities;
- Will contests;
- work disability and;
- fitness for police officer duty, hospital professional staff function, Professional Board of Registration licensure;
- wrongful termination;
- record reviews in divorce and liability matters;
- civil rights suit by a prisoner severely beaten by correctional officers in a Massachusetts penal setting.
- mental state at time of a crime;
- presence of Addiction and potential treatment for convicted and sentenced prisoners.
- Under the auspices of the Physicians for Human Rights Refugee Asylum Network, I have done pro bono evaluations and testimony for male and female torture survivors from Europe, Africa, North and South America, and the Caribbean. The Immigration and Naturalization Service and Homeland Security had deemed their reports of torture to be not credible, denied them asylum, and was planning to deport them; to their former homeland sites of torture.

I provide direct office-based Psychiatric services to a general adult population, with concentration in the Addictions and Geriatrics; and consult to primary care teams and

10/07/2009 14:45 6177342757     Barry Roth,MD     #0135 P.011/019
Case 1:08-cr-10223-PBS   Document 76-4   Filed 12/18/2009   Page 12 of 18

Barry H. Roth, M.D. -- Page 7

staff on residents in total care environments. I do provide direct clinical treatment to patients who were victims of "ethnic cleansing" and violence, distinct from my forensic work.

My clinical practice has encompassed an extremely wide range of sophisticated, responsible, in-depth and practical healing of common and widespread suffering of individuals in our culture. Although specific elements have varied in importance at any given time, during my thirty-seven years as a medical professional I have maintained a commitment to the disenfranchised, weak and scorned, as well as to the mainstream. My achievement of Certification by the American Society of Addiction Medicine in 1988, and Certificates of Added Qualifications in Addiction Psychiatry (1993), Geriatric Psychiatry (1994), and Forensic Psychiatry (1999) attest to my broad and deep knowledge base.

Spanning my entire career I have made research, clinical theory and practice reports and done clinical teaching. One focus has been public service and public policy. The other major focus has been to formulate and synthesize working applications of general psychological theory, both as it shapes intensive individual psychotherapy and treatment of the addictions; and in lessening the danger of weapons of mass destruction.

The following describe my efforts in the public policy realm. As a medical student I did research and reporting on Medical Student Minority Admissions Policies and on Unmet Health Care Needs of the Elderly.

As Intern in Medicine, and in the year following (preceding Psychiatric Residency), I researched and reported on "Patient Dumping" in Alameda County, and testified in California Senate Hearings on public hospitals that had closed, were scheduled to be closed, and threatened-to-be-closed public hospitals. I ran an Infirmary at the San Francisco County Jail and informed Federal Court Master oversight of constitutionally mandated upgrades in health care in that jail. I participated in Marijuana Research at Langley Porter Associated Activities, UCSF, with Reese Jones, M.D. and Neil Benowitz, M.D. Additionally, I advised the San Francisco Neighborhood Legal Assistance Foundation (SFNLAF) in class-action suits on behalf of California Medicaid recipients enrolled in Prepaid Health Plans (PHP's). SFNLAF responded to fiduciary breaches by the PHP's to implementation of statutes, regulations, and administrative implementations by these California precursors to Health Maintainence Organizations (HMO's).

During Residency at the Massachusetts Mental Health Center I researched shifts in the patient population related to deinstitutionalization and catchmenting, as well as the impact on training. I also participated in Heroin Research at McLean Hospital under the auspices of Steve Mirin, M.D.

I worked actively in Physicians for Social Responsibility to educate the public on the health consequences of nuclear war. My many and varied academic presentations on Nuclear Arms and Narcissism completely interdigitated with that work.

My pro bono forensic work with the Physicians for Human Rights and, also, regarding Massachusetts penal conditions, has related directly to public policy--- both on an individual and on the national level. My observations during human rights delegations and my work products in our legal system have continued to mutually inform each other.

My clinical teaching has been almost entirely the public sector: Massachusetts Mental Health Center; Brockton and San Francisco VA Medical Centers; and Beth Israel Deaconess Medical Center West Campus, with its state hospital Replacement Unit.

The following illustrate contributions in the realm of general psychological theory and practice. Shortly after residency I took a primary role to formulate with Leston L. Havens, M.D. a case report of intensive psychotherapy, which we presented together at a psychoanalytic conference plenary session.

I have presented several syntheses of work and theory from my immersion in treatment of alcoholism. I reported on the inpatient care of alcoholics at the Brockton Veterans Administration Medical Center in a panel I organized with collegues, at the American Psychiatric Association Institute on Hospital and Community Psychiatry, 1980. I have presented several versions of Convergences of Alcoholics Anonymous' 12-Steps and Psychodynamic Psychotherapy.

Related to both—and based in my own patient care and observations---I applied and extended biopsychosocial theory in my formulation of the interdependence of inborn tendencies (biologic), psychodynamic theory, and social reality in my many presentations "Nuclear Arms and Narcissism" in professional meetings from Los Angeles to Vienna and Amsterdam.

## B. Funding Information

| | |
|---|---|
| 1970 | University of Rochester School of Medicine and Dentistry, Summer Grant for study of medical school minority student admissions policies. |
| 1977-1978 | Research into shifts in the patient population and training at the Massachusetts Mental Health Center, assisted by Lester Grinspoon, M.D. |
| 1971 | Study of unmet needs of healthcare of the elderly, Monroe County Hospital, stipend. |

### C. Report of Current Research Activities

I have been an active participant in the Program in Psychiatry and the Law at the Massachusetts Mental Health Center during the past five years. First, I provided questions and written items for questionnaire surveys for Informed Consent projects with Professor Thomas Gutheil, M.D., Co-founder, and Assistant Professor Michael L. Commons, Ph.D., Director of Research.

Informed Consent research grows naturally from my preceding professional activities along several vectors. The frame and context of Informed Consent should be the respectful negotiation of interdependent relationships -- variously characterized by discordant, unequal, or diametrically opposed roles of power and/or authority; in a spectrum from adversary to alliance. Implicit in the "informed" element is the reasonable exchange of information relevant to the problem at hand -- be that the relief of suffering, or the discernment of medical certainty in matters of legal consequence. The "consent" aspect requires voluntary, competent and truthful participation of both parties, free of confusion, ambiguity, obfuscation, fraud, coercion or malice. Risks, limits and choices must be clear. This process is *interdependent* because both roles in the dyad co-arise dependent on the other. The matrix manifests from the biopsychosocial dynamics of the individual, mutually interplaying with his or her environment, according to the current social contract.

Subsequently, I have made contributions to research on guardianship; forensic psychiatric expert witness bias; clinician/expert boundary parameters; dynamics of attorney-expert working relationships; and plagiarism.

Currently Dr. Commons and I are constructing a pilot study regarding post traumatic stress disorder observed in Refugee Asylum torture survivors.

These concerns are central to all clinical teaching and research interests, both narrowly defined, and in relation to our communities and society at large.

### D. Report of Teaching

#### 1. Local Contributions

| | |
|---|---|
| 1978-1987<br>1994-2000 | Harvard Medical School, Clinical Instructor and Instructor in Psychiatry: supervision of psychiatric residents, psychology interns, nurses, social workers, occupational therapists, and medical students at Massachusetts Mental Health Center, Brockton Veterans Administration Medical Center, Mount Auburn Hospital, Cambridge Hospital, and New England Deaconess |

Hospital/Beth Israel Deaconess Medical Center.

## 2. Regional, National or International Contributions

| | |
|---|---|
| 1975 | Clinical Instructor, Ambulatory and Community Medicine, University of California at San Francisco: preceptor for a Family Medicine Resident, studying the impact of Prepaid Health Plans, on his patient population |
| 1984-1985 | Assistant Clinical Professor of Psychiatry supervising Psychiatry Fellows in Alcoholism and Substance Abuse, San Francisco Veterans Administration Medical Center, University of California at San Francisco. At that time I supervised H. Westley Clark, M.D., J.D., MPH., now Director, Center for Substance Abuse Treatment, Rockville, Maryland. |
| 1994-Present | Lamp Transmission (Ordination as Dharmacharya, or Lineage Teacher), 42nd Generation Lam Te Dhyana [Sanskrit for "Zen"] School. 8th Generation of the Lieu Quan Dharma Lineage Vietnamese Zen Master Thich Nhat Hanh, August 11, 1994, Plum Village, Meyrac, Bordeaux, France |
| | Buddhism can be described as a science of the mind. Zen Buddhist meditation engages and harnesses human psychophysiology to reduce suffering and promote health within alternate and complementary paradigms to Western psychology and psychiatry. |
| 2005 | In-service training to the Boston Center for Refugee Health and Human Rights, Department of Psychiatry, Boston Medical Center. |

## E. Report of Clinical Activities

1. Description of clinical practice: Solo general Adult psychiatric practice, with specialization and emphasis in Addiction Psychiatry, Geriatric Psychiatry and Forensic Psychiatry, as well as consultations in total care institutions; and forensic expert efforts. And large portion of my practice includes trauma survivors, immigrants, including victims of ethnic cleansing, first generation born in America children, and office based opioid maintenance with Suboxone.

10/07/2009 14:47 6177342757  Barry Roth,MD  #0135 P.015/019
Case 1:08-cr-10223-PBS   Document 76-4   Filed 12/18/2009   Page 16 of 18

Barry H. Roth, M.D. -- Page 11

Prior foci of practice included fifteen years of Attending psychiatric patients in General Hospital, Chemical Dependence, Geriatric and Adolescent psychiatric inpatient settings. (The latter included cases from the Division of Youth Guidance and the Division of Child Services, for which I sought supervision by Helen Gurin, Senior Social Worker at Judge Baker Child Guidance Clinic, Boston).

I have provided electroconvulsive therapy to hospitalized and ambulatory patients through the 1980s and 1990s. I consulted on general medical surgical patients intensive care units and emergency room settings through most of the 1980s and 1990s.

2. Patient load: Current patient load is approximately 30 clinical contact hours weekly. Cases include a high level of both medical complexity in the geriatric and addiction populations, as well as a high level of psychiatric complexity and co-morbidity in patients with both mental illness and chemical dependency ("dual diagnosis"). The forensic work has been described above.

3. Clinical contributions and other relevant information: See Bibliography.

## PART III: Bibliography

### Clinical Communications:

1. University grant-sponsored research, 1970, Medical School Minority Student Admissions Policies. I did this project while a member of the Medical Student Body Senate, and reported findings to several student and faculty gatherings. This preceded by about a year the significantly increased diversification of the student body at the University of Rochester School of Medicine and Dentistry. I also reported informally in my role as student Senate representative at the Annual Meeting of the American Association of Medical Colleges, in 1971 in San Diego.

2. Research on the unmet health care needs of the elderly, supported by and reported to T. Franklin Williams, M.D., then Medical Director of the Monroe Community Hospital, subsequently Director of the National Institute on Aging.

    a) "Health Care Planning for Elderly in Monroe County," August, 1971; and
    b) "Unmet Health Needs of Senior Citizens," September, 1972.

    This research project was also the subject of an article in the Rochester, New York, "Times Union" newspaper, Tuesday, July 1, 1971, "U R a Student Studying Medical Needs Care."

3. Article on Patient Dumping in the <u>Health Policy Advisory Center Bulletin</u>, No. 58, May/June 1974, 17 Murray Street, New York, NY 10007

4. Testimony, Senate Subcommittee on Medical Education and Health Needs, Hearings on the Closing of County Hospitals, commissioned by Chairman Mervyn M. Dymally, Senate Committee on Health and Welfare, California Legislature, August 5, 1974, Sacramento, CA.

5. Presentation of paper, "Toward a General Theory of Psychotherapy," with co-author Leston L. Havens, presented at the William Alanson White Institute, Harry Stack Sullivan Commemorative Symposium: Psychoanalysis, 1980: Converging Views, Plenary Session and Panel Discussion, January 27, 1980, New York, NY.

6. Presentation of paper, "Short-term In-patient Alcoholism Treatment: Psychiatric Approach to Patient and Staff Individual and Group Issues," presented at the 32nd Annual American Psychiatric Association Institute on Hospital and Community Psychiatry, in the panel, "The Alcoholic, Where? Lost between Medicine and Psychiatry" (Panel Co-chair), September 15-18, 1980.

7. Presentation of paper, "The Massachusetts Mental Health Center Patient Population, 1965-1975: Implications of Catchment-Area Enactment for Services and Training," at the American Orthopsychiatric Association 58th Annual Meeting, Theme: "Interdisciplinary Practice-Public, Professional and Political Issues," in Panel 118, Psychotherapy for People Without Money, March 30, 1981.

8. Presentation of paper, "Convergences of Biopsychosocial Systems Theory, Psychoanalytic, Psychodynamics, and Alcoholics Anonymous 12 Steps Practice," at the Grand Rounds, Brockton Veterans Administration Medical Center, May 11, 1982.

9. Presentation to Brockton Hospital, Department of Medicine Grand Rounds, Psychological Aspects of the Threat of Nuclear War" June, 1983.

10. Presentation of "Nuclear Arms and Narcissism" in evolving versions at: VII World Congress of Psychiatry, Paper Session "Violence and Aggression," July 14, 1983, Vienna, Austria.

11. Presentation of "Nuclear Arms and Narcissism", American Psychiatric Association 137th Annual Meeting, Paper Session: "Psychiatric Considerations and the Threat of Nuclear War" (Chairperson, Roy Menninger, M.D.), May 10, 1984, Los Angeles, CA.

Barry H. Roth, M.D. -- Page 13

12. Poster Group "Nuclear," American Orthopsychiatric Association 62nd Annual Meeting, April 21, 1985, New York, NY.

13. Presentation in Paper Session: "Nuclear War and Psychiatry," First Baltimore International Congress of Transcultural Psychiatry," July 5, 1985, Baltimore, MD.

14. Presentation, "Psychological Aspects of the Threat of Nuclear War" Department of Psychiatry Grand Rounds, Mount Auburn Hospital, Fall 1985.

15.. Presentation of paper, "Convergence of Alcoholics Anonymous, Biopsychosocial Systems and Analytic Theory," at Mount Auburn Hospital Department of Psychiatry Grand Rounds, December 10, 1985.

16. Presentation, "Convergence of AA and Psychodynamic Psychotherapy," at the Massachusetts Psychiatric Society Committee on Alcoholism and the Addictions, Co-Sponsored with the American Medical Society on Alcoholism and Other Drug Dependencies, Harvard Faculty Club, Cambridge, December 3, 1986.

17. Chairperson and Presenter, Paper Session: "Nuclear War and its Prevention," International Society of Political Psychology, 9th Annual Scientific Meeting, Amsterdam, Holland, June 30, 1986.

18. Paper Presentation, "Nuclear Arms and Narcissism" International Society of Political Psychology, July, 1988, Seacaucus, New Jersey

19. Presentation, "Alcoholism and Narcissism", New England Deaconess Hospital Psychiatry Social Workers, January 9, 1993

20. Presentation, "Treatment of Alcoholism", New England Baptist Hospital Department of Medicine, Grand Rounds, 1993